UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 19-80032-CR-RKA

UNITED STATES OF AMERICA,
   Plaintiff,
  v.
CHRISTOPHER TOVARRIS WILKINS,
   Defendant.

. Fort Lauderdale, Florida
. October 15, 2019
. 1:45 p.m.

Transcript of Motion Hearing had
before the Honorable Roy K. Altman,
United States District Judge.

Exhibit A

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

**2**

APPEARANCES:

For the Government: John C. McMillan
  United States Attorney's Office
  500 South Australian Avenue
  Suite 400
  West Palm Beach, Florida 33401

For the Defendant: Ronald S. Chapman, Esq.
  400 Clematis Street
  Suite 206
  West Palm Beach, Florida 33401

Court Reporter: Francine C. Salopek, RMR, CRR
  Official Court Reporter
  United States District Court
  299 E. Broward Blvd., Room 207B
  Fort Lauderdale, Florida 33301
  (954)769-5686

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

**3**

1    TUESDAY, OCTOBER 15, 2019, 1:45 P.M.
2   (The Judge entered the courtroom)
3  THE COURT: Good afternoon. Please be seated.
4  MR. MC MILLAN: Good afternoon, your Honor.
5  ROOM CLERK: Calling Case Number 18-80032-Criminal,
6 United States of America vs. Christopher Tovarris Wilkins.
7  Counsel, please state your appearances for the record.
8  MR. MC MILLAN: Good afternoon your Honor. John
9 McMillan on behalf of the United States. With me at counsel's
10 table is Special Agent Sara Connors of the Bureau of Alcohol,
11 Tobacco, Firearms and Explosives.
12  THE AGENT: Good afternoon, your Honor.
13  THE COURT: Good afternoon to you both.
14  MR. CHAPMAN: Good afternoon, your Honor. Ron Chapman
15 for Mr. Wilkins, who's also present.
16  THE COURT: Good afternoon to you both.
17  THE DEFENDANT: Good morning (sic).
18  THE COURT: We're here not for calendar call but
19 because Mr. Wilkins has submitted a motion to remove
20 Mr. Chapman from the case.
21  Mr. McMillan, have you seen that motion?
22  MR. MC MILLAN: I have, your Honor.
23  THE COURT: Does the government have any position on
24 the motion?
25  MR. MC MILLAN: No, your Honor. This would be the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

**4**

1 second motion that the defendant has filed in this regard, so I
2 appreciate the Court having this hearing so we can resolve it.
3 Thank you.
4  THE COURT: Well, also, if I give him a new lawyer,
5 we're going to have to give the new lawyer a substantial
6 continuance, which I'm not inclined to do.
7  Does the government have any position on that?
8  MR. MC MILLAN: Your Honor, we're preparing for trial
9 at the end of this month, as per the Court's instructions.
10 Mr. Chapman has been in all regards a fine attorney in this
11 case, as he has been in every other one I've had him as
12 opposing counsel on. I obviously have to defer to your Honor
13 as to whether or not there's grounds in any case to replace
14 counsel. But the government sees no grounds, at least based on
15 this motion, other than the possibility of the breakdown in
16 communications that I'm not privy to.
17  THE COURT: Well, that's not what he said. He said
18 that Mr. Chapman is conspiring with you, and also that
19 Mr. Chapman is ineffective. So, let me close the courtroom.
20 I'll ask you and the agent to please step outside, and I'll
21 call you back in when we're done.
22  MR. MC MILLAN: Thank you, your Honor.
23  THE COURT: Thank you all.
24  (Mr. McMillan and Agent Connors exited the courtroom)
25  (The following proceedings were ordered sealed:)

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**Page 5**

SEALED PROCEEDINGS

1  THE COURT: All right. Let the record reflect that we
2  have locked the courtroom. Government counsel and the agent
3  are outside. I'm here just with the two marshals and my court
4  security officer and my staff, along with the defendant, of
5  course, and Mr. Chapman.
6  Mr. Wilkins, let me hear from you. What appears to be
7  the issue? I read your motion about a conspiracy between
8  Mr. Chapman and Mr. McMillan. That's absurd. And I'm --
9  before you respond to that, I'm not going to kick Mr. Chapman
10 off because you think he's conspiring with the government.
11 It's just not true.
12 Mr. Chapman's been a lawyer in this community for a
13 very long time and has a great reputation. He's looking out
14 for your own best interests. You may not agree with his
15 advice. That's perfectly within your rights. But to suggest
16 that he's conspiring with the government attorney, I'm just not
17 going to be persuaded by that.
18 THE DEFENDANT: Okay. I understand where you're
19 coming from, but I'm not new to the federal system. As you can
20 see, I been through the federal system before.
21 THE COURT: I understand.
22 THE DEFENDANT: And I was looking at my indictment,
23 and I was under the impression by law reading that I got
24 superseded two new counts. Now, I already know I have Count 1,
25 2, 3, and 4, and 5, as already the standard (sic) where I'm

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**Page 6**

SEALED PROCEEDINGS

1  gonna be charged and how I'm gonna be charged. But when I get
2  the new superseding indictment, I see Count 3 -- that Count 3
3  on the firearm, a firearm was added and the dates was
4  broadened. I never been charged -- I never seen a person get
5  charged with possession of conspiracy to possess a firearm.
6  It's either you're gonna be -- you're gonna get charged on the
7  actual date or you gonna get, you know --
8  THE COURT: So, I'll just tell you that as a matter of
9  law -- and I'm sure you've had these conversations with
10 Chapman -- first of all, let me say, I understand your
11 frustration. I'm not suggesting that you shouldn't be
12 frustrated.
13 THE DEFENDANT: Right.
14 THE COURT: But as a matter of law, you happen to be
15 incorrect as to the law. Of course the government can
16 supersede to add additional counts that include, among other
17 things, broader conspiracy dates, if the grand jury returns an
18 indictment with respect to those broader conspiracy dates.
19 And, also, the government can -- that is a charge --
20 under 18, United States Code, Section 924(o), there is a charge
21 for conspiracy to possess a firearm. And the reason for that,
22 of course, is because two people can work together to possess a
23 firearm.
24 I'll give you a very simple example. Let's say that
25 the two of us were going to go rob a bank, and person A is

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**Page 7**

SEALED PROCEEDINGS

1  going to be the guy who drives the car, and person B is going
2  to be the guy who carries the firearm. And they go into the
3  bank a week later and rob the bank, one with the firearm, one
4  with the car. Of course, they've conspired not just to rob the
5  bank, but they've also conspired to use the firearm -- possess
6  the firearm during the course of that robbery.
7  So, that is an available charge. Of course I don't
8  know exactly what your discussions were to that effect, but if
9  Mr. Chapman told you that there's nothing inappropriate in that
10 charge, then I think that, based on what you've told me, that's
11 probably right, because that is an available charge under the
12 law.
13 THE DEFENDANT: I understand that. I was charged with
14 a 922(g)(1) and 924(a)(2), and that's not an "o," it's not a
15 924(o).
16 THE COURT: Well, let me look at your -- I haven't
17 looked at your new superseding indictment since it came out.
18 So, let me pull it up, and we can talk about Count 3.
19 Is it in here?
20 ROOM CLERK: It should be. It's Docket Entry 57.
21 (Discussion had off the record)
22 THE COURT: All right. It looks like it's Docket
23 Entry Number 57. I'm pulling it up now.
24 You said it was Count 3, Mr. Wilkins?
25 THE DEFENDANT: Yes, sir. It was Count 3, and another

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

**Page 8**

SEALED PROCEEDINGS

1  firearm was added as well.
2  THE COURT: All right. So, Count 3 says -- well,
3  Count 3 is a possession of a firearm charge. Count 3 says that
4  between May of 2017 and September of 2017, you knowingly
5  possessed one or more firearms -- a Taurus Model Slim, a
6  9-millimeter semi-automatic, and a Russian Makarov
7  9-millimeter -- knowing that you had been previously convicted
8  of a crime punishable by imprisonment for a term exceeding one
9  year.
10 So, that's not a conspiracy count, actually. It's
11 just a regular firearm count in Count 3. Am I looking at the
12 wrong one?
13 THE DEFENDANT: You're looking at the right one.
14 THE COURT: So, everything I said before is still true
15 about there being the possibility of charging you with a
16 conspiracy to possess a firearm. But that count, in any event,
17 Count 3, doesn't charge you with possession -- conspiracy to
18 possess a firearm. It just charges you with possession of a
19 new firearm. I wasn't in the grand jury, but if the grand jury
20 thought there was enough evidence to go forward on that
21 firearm, then it was perfectly appropriate for the government
22 to bring that count against you. There's nothing I see here
23 that's untoward with respect to that.
24 THE DEFENDANT: Okay. I was looking at the Federal
25 Rule of Criminal Procedure 12(b)(3)(B) --

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

SEALED PROCEEDINGS 9

1   THE COURT: Hold on. Let me look. One second.
2   (Pause)
3   THE COURT: 12(b)(3)(B), yes, sir.
4   THE DEFENDANT: It says joining two or more offenses
5   in the same count, duplicity.
6   THE COURT: Okay.
7   THE DEFENDANT: He put two firearms in one count.
8   THE COURT: Right.
9   THE DEFENDANT: He broadened it. But my original
10  indictment, it only had one firearm on the one count.
11  THE COURT: Yeah. But if you possessed both firearms
12  at the same time, then that's one crime. You don't have to be
13  charged with two different counts for possessing both firearms
14  at the same time. If you're walking around, and in your house
15  you've got ten firearms, then you've possessed all ten firearms
16  at a particular time. It could be one day, it could be one
17  year, if the ten firearms were in your house for a year.
18  There's nothing duplicitous or duplicative about charging you
19  in one count with the possession of those ten firearms at once.
20  Let me give you another example that might be an
21  easier example. Imagine you -- and I'm not saying that you
22  did, I don't know the facts of this case, so I'm just throwing
23  it out there -- imagine if you possessed ten kilograms of
24  cocaine in your house, the government doesn't have to charge
25  you with possession of ten separate kilograms in ten counts.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

SEALED PROCEEDINGS 10

1   They just have to charge you with possession of the cocaine,
2   and they can show the jury that it was ten different kilos of
3   cocaine. Does that make sense?
4   THE DEFENDANT: Yes, it makes sense.
5   THE COURT: So, I don't see anything inappropriate
6   with respect to -- is what you're saying that you told
7   Mr. Chapman you wanted him to file motions about the conspiracy
8   in Count 3 and about 12(b)(3)(B) with respect to the multiple
9   guns?
10  THE DEFENDANT: Yes, sir.
11  THE COURT: So, look, I'm not your lawyer, obviously,
12  and I'm not a lawyer anymore, and I'm not allowed to give legal
13  advice. But I am looking at these allegations that you're
14  making, and I don't find that -- if Mr. Chapman in fact told
15  you he didn't think that there were good grounds for those
16  motions, I'm not -- I don't see here anything that would
17  suggest to me that he's wrong about that.
18  THE DEFENDANT: I understand.
19  THE COURT: Okay?
20  THE DEFENDANT: And my next issue was Count 6 and 7.
21  THE COURT: Let me look at it first.
22  (Pause)
23  THE COURT: Count 6 has to do with the alleged
24  intimidation of C.S.?
25  THE DEFENDANT: Right.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

SEALED PROCEEDINGS 11

1   THE COURT: And Count 7 has to do with... okay. So,
2   Count 6 charges you with allegedly threatening or trying to
3   persuade C.S. in a way that would prevent her from testifying
4   in the grand jury investigation.
5   Count 7 charges you separately with trying to threaten
6   C.S. in order to prevent her from providing information
7   relating to the commission of a federal offense. Are those the
8   two you're talking about?
9   THE DEFENDANT: Yes, sir.
10  THE COURT: Okay. Tell me about that.
11  THE DEFENDANT: They put in that -- they put on
12  Count 6 and 7 that I was in Palm Beach County at the time of
13  these alleged incidents, when I was in fact incarcerated at
14  Coleman USP penitentiary in Sumterville, Florida. The venue is
15  wrong.
16  THE COURT: Well, that doesn't have to do with venue.
17  So -- by the way, I have no idea where Coleman is. Do we agree
18  that it's not in Palm Beach County?
19  MR. CHAPMAN: Yes.
20  THE COURT: Okay. So, two things about that. One,
21  venue lies in the whole Southern District of Florida. So, my
22  jurisdiction technically is from Key West all the way up north
23  of Ft. Pierce. So, we've divided it up for convenience between
24  West Palm Beach, the division, and Broward, the division, and
25  Dade, the division, and Monroe County, the divisions, but

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

SEALED PROCEEDINGS 12

1   there's no legal reason why it has to be that way.
2   In fact, as I understand it, yours is a West Palm
3   case, right?
4   THE DEFENDANT: Yes, sir.
5   THE COURT: Where do you live?
6   THE DEFENDANT: At that time, when that alleged
7   happened, I was in Coleman. I was in prison.
8   THE COURT: No, I don't mean that. I mean --
9   THE DEFENDANT: West Palm Beach.
10  THE COURT: You lived in West Palm Beach.
11  You see, my point is that the events in question
12  allegedly in your indictment took place in West Palm Beach, and
13  yet your case is going to be tried by a Broward judge. And
14  that shows that there's actually no venue issue between Broward
15  and Palm Beach. We're just divisions that the Court has
16  created in order to make this convenient for litigants and
17  lawyers.
18  Because, you know, if we only had one courthouse, it
19  would probably be in Miami, because that's where most people
20  are, but the district is so long, it goes from Key West all the
21  way to past Ft. Pierce, that what you'd essentially be doing
22  is -- lawyers and people like you who are being tried for their
23  cases would have to drive down every day for jury trials from
24  Ft. Pierce, and we decided -- and I think Congress agreed, but
25  don't quote me on that -- that it made sense for us to divide

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

1  it up in this way just to make it easier for you. But it's not
2  a hard and fast rule, and it certainly doesn't present a venue
3  problem.
4      Now, as to the factual issue, certainly you should be
5  allowed to raise a defense that you weren't in Palm Beach at
6  the time that this alleged event occurred. I'll just tell you
7  that it does allege that you were in Palm Beach and elsewhere,
8  which they do in order to try to broaden their scope if they
9  don't know exactly where you are, but that's not a grounds to
10 dismiss the indictment or that count. It's just an argument
11 you're going to be able to show that the indictment might be
12 wrong.
13     So, for example, let's say that -- to use back our
14 analogy from the beginning -- person A was charged with bank
15 robbery on January the 1st, and person A is going to be able to
16 show that he was actually fishing in Alaska on January the 1st
17 with his wife. That's not grounds to dismiss the indictment.
18 That's just a defense that he's going to be allowed to raise at
19 the time of the trial. Those are two different things.
20     So, again, reading between the lines, if what you're
21 saying is that Mr. Chapman wasn't willing to file a motion to
22 try to dismiss the indictment based on improper venue, again I
23 don't think that he was wrong in making that decision. Does
24 that make sense?
25     THE DEFENDANT: Yes, sir. I understand.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1      THE COURT: Okay.
2      THE DEFENDANT: And the last thing I asked him was to
3  hire a firearm expert that I really needed for trial. That's
4  the last piece of evidence I was gonna use as a defense for my
5  trial. And I haven't seen that happen.
6      THE COURT: Well, let me hear from Mr. Chapman on that
7  then. I think I approved fees for an expert, didn't I?
8      MR. CHAPMAN: You did, Judge, for a cell phone expert.
9      THE COURT: Right. That's what it was.
10     MR. CHAPMAN: That cell phone expert is also a retired
11 police officer. And I also asked him about -- to look at the
12 gun, this gun issue that Mr. Wilkins is concerned about. And
13 in this case, he is -- so far he has agreed with the
14 government's expert.
15     Now, I am going to call him again about this. And
16 I've even explained to Mr. Wilkins that there is another
17 firearms expert, who I know, who I think I'm going to just --
18 if he'll do this for me -- just send him the pictures of the
19 guns that I have and see if he is also in agreement with --
20     THE COURT: Or not. And if he's not, you should
21 certainly submit a motion for fees, and I'm happy to retain him
22 on Mr. Wilkins' behalf, paying for it out of the Court's funds.
23 Okay?
24     MR. CHAPMAN: That's -- thank you, Judge.
25     THE COURT: Does that resolve that issue, Mr. Wilkins?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1      THE DEFENDANT: Yes, sir.
2      THE COURT: Okay.
3      Any other issues with Mr. Chapman other than the ones
4  we've just addressed?
5      THE DEFENDANT: No, that's all I was addressing,
6  that -- the situation about the firearm expert, and the, uhm --
7  waiting on the Coleman USP records as far as the visitation
8  situation for my defense. That's it.
9      THE COURT: What's the -- you mean because you weren't
10 there -- because you weren't in West Palm on the date in
11 question, is that what you're saying?
12     THE DEFENDANT: No, sir. I was saying about the
13 visitation -- request the log printout as far as who came to
14 see me while I was incarcerated.
15     THE COURT: I see. Okay. All right. But that has
16 nothing to do with Mr. Chapman.
17     THE DEFENDANT: No, sir. We just waiting on that.
18     THE COURT: Okay. Good.
19     So, have I addressed all your concerns about
20 Mr. Chapman in a way that's satisfactory to you?
21     THE DEFENDANT: Yes, sir.
22     THE COURT: Okay. So, are you going to withdraw your
23 motion?
24     THE DEFENDANT: Yes, sir, I withdraw my motion.
25     THE COURT: Okay.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

1      All right. So, I'll just deny the motion as moot in
2  light of that.
3      Are we done? Can I bring the government back in?
4      THE DEFENDANT: Yes, sir.
5      THE COURT: All right. Thank you all very -- is there
6  anything you want to say, Mr. Chapman?
7      MR. CHAPMAN: No, your Honor.
8      THE COURT: All right.
9      Yes, sir, Mr. Wilkins.
10     THE DEFENDANT: Uhm, I also sent the attachment that I
11 wanted to be took (sic) into consideration, though, as far as
12 the prosecutor misconduct that I been raising the issue about
13 that. Because ever since I got resentenced pertaining to that
14 issue, that's when this conduct started coming.
15     THE COURT: This is the issue relating to your other
16 2255 case?
17     THE DEFENDANT: Yes, sir.
18     THE COURT: What is it that you would like for me to
19 do with respect to that other case?
20     THE DEFENDANT: I just wanted you to be able to see
21 what's going on, because ever since I won that -- and
22 successfully won that appeal, the government been continuously,
23 you know, after me. This is the same prosecutor from my first
24 case, the same agent from my first case. They have been
25 vindictively attacking me since I been released from the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

17

SEALED PROCEEDINGS

1  Federal Bureau of Prisons. I wasn't only on the streets for
2  six days after being released from the federal custody, and
3  they continuously been bothering me throughout my whole
4  24 months of being incarcerated.
5      THE COURT: All right. So, let me say a couple of
6  things about that. The first is, if there's some misconduct
7  that you're alleging that took place in your other case, of
8  course you need to raise it in that other case. Although, your
9  case, it seems like you prevailed, so I don't think you want to
10 wake that sleeping bear.
11     THE DEFENDANT: I did address it.
12     THE COURT: Right. So, in my case, I haven't seen any
13 prosecutorial misconduct in my case. But if you feel that
14 there's some kind of vindictive prosecution that's taking place
15 here, that has nothing to do with firing your lawyer, you
16 should raise that with your lawyer and have your lawyer file a
17 motion with me, if he believes that the standard has been met.
18     I'll warn you that your lawyer is probably going to
19 tell you that the standard in showing a vindictive or malicious
20 prosecution is extremely high under the law. Basically -- and
21 this isn't exactly 100 percent right on -- he can tell you
22 exactly the case law, but you're going to have to show either
23 that the prosecutor is coming after you only because of your
24 race or that he's coming after you with no basis whatsoever for
25 the criminal conduct, but only because he doesn't like you or

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

18

SEALED PROCEEDINGS

1  he hates you or he wants to get back at you for some reason.
2  But if there's even some evidence that you engaged in the
3  conduct that's alleged, you're going to have a very difficult
4  time prevailing on that motion.
5      But, again, I'm not your lawyer, and that's something
6  that you and he should discuss at a later time. Okay?
7      THE DEFENDANT: Yes, we already discussed it.
8      THE COURT: But I have reviewed everything that you've
9  submitted to me.
10     THE DEFENDANT: Yes, sir.
11     THE COURT: All right.
12     Go ahead. Please bring them in.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

19

1      (The foregoing proceedings were sealed)
2      (Mr. McMillan and Agent Connors entered the courtroom)
3      THE COURT: Good afternoon, folks.
4      MR. MC MILLAN: Good afternoon, your Honor.
5      THE COURT: Let the record reflect the prosecutor and
6  the agent have returned to the courtroom.
7      Mr. Wilkins has withdrawn his motion. And so, I'll
8  deny it as moot in light of that. Given that, we're going to
9  proceed with the calendar call on Tuesday afternoon. I think
10 you are first up for trial the following week. I'll just give
11 you a sneak peek in that respect.
12     But -- well, there's a way in which you might be
13 second, but I think that case is going to go away. So, for all
14 practical purposes, I think you will be first. I am not here
15 the 28th and the 29th, which is Monday and Tuesday. So, we
16 will likely start on Wednesday, the 30th. But we can confirm
17 all of this at the time of the calendar call. Okay?
18     MR. MC MILLAN: Yes, your Honor.
19     THE COURT: Anything else from the United States?
20     MR. MC MILLAN: No, your Honor.
21     THE COURT: And I will -- I know that there are
22 pending motions in limine on the same or similar issues, and
23 those will be addressed at the calendar call.
24     MR. MC MILLAN: Yes, your Honor.
25     THE COURT: Anything else from the defense?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

20

1      MR. CHAPMAN: No, your Honor.
2      THE COURT: All right. Thank you all. Have a good
3  afternoon.
4      MR. MC MILLAN: Thank you, your Honor.
5      (Proceedings concluded at 2:06 p.m.)
6      - - - - -

19            C E R T I F I C A T E
20     I hereby certify that pursuant to Section 753,
21 Title 28, United States Code, the foregoing is a true and
22 correct transcript from the record of proceedings in the
23 above-entitled matter.
24
25 /s/Francine C. Salopek           5-31-2020
   Francine C. Salopek, RMR-CRR    Date
   Official Court Reporter

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

21

/
/s/Francine [1] 20/24

1
100 percent [1] 17/21
12 [3] 8/25 9/3 10/8
15 [2] 1/7 3/1
18 [1] 6/20
19-80032-CR-RKA [1] 1/4
1:45 [2] 1/8 3/1
1st [2] 13/15 13/16

2
2017 [2] 6/4 6/4
2019 [2] 1/7 3/1
2020 [1] 20/24
206 [1] 2/6
207B [1] 2/9
2255 [1] 16/18
24 months [1] 17/4
28 [1] 20/21
26th [1] 18/15
289 [1] 2/9
29th [1] 19/15
2:06 [1] 20/5

3
30th [1] 18/16
33301 [1] 2/9
33401 [2] 2/4 2/6

4
400 [2] 2/3 2/5

5
5-31-2020 [1] 20/24
500 [1] 2/3
5686 [1] 2/10
57 [2] 7/20 7/23

7
753 [1] 20/20
769-5686 [1] 2/10

9
9-millimeter [2] 8/6 8/7
922 [1] 7/14
924 [3] 6/20 7/14 7/15
954 [1] 2/10

A
above [1] 20/23
above-entitled [1] 20/23
absurd [1] 5/8
add [1] 6/16
added [2] 6/3 6/1

MR. CHAPMAN: [7]
MR. MC MILLAN: [11]
ROOM CLERK: [2] 3/5 7/20
THE AGENT: [1] 3/12
THE COURT: [58]
THE DEFENDANT: [36]

address [1] 17/11
addressed [3] 15/4 15/19 19/23
addressing [1] 15/5
advice [2] 5/15 10/13
afternoon [11]
agent [7]
Agent Connors [2] 4/24 19/2
Agent Sara [1] 3/10
agree [2] 5/14 11/17
agreement [1] 14/19
Alaska [1] 13/16
Alcohol [1] 3/10
allegations [1] 10/13
allege [1] 13/7
alleged [5]
allegedly [2] 11/2 12/12
alleging [1] 17/7
allowed [3] 10/12 13/5 13/18
Although [1] 17/8
Altman [1] 1/14
AMERICA [2] 1/6 3/6
America vs. Christopher [1] 3/6
analogy [1] 13/14
anymore [1] 10/12
appeal [1] 18/22
appearances [2] 2/1 3/7
appreciate [1] 4/2
approved [1] 14/7
argument [1] 13/10
attachment [1] 16/10
attacking [1] 18/25
attorney [2] 4/10 5/16
Attorney's [1] 2/2
Australian [1] 2/3
automatic [1] 8/6
Avenue [1] 2/3

B
bank [5]
basis [1] 17/24
Beach [11]
bear [1] 17/10
beginning [1] 13/14
believes [1] 17/17
Blvd [1] 2/9
bothering [1] 17/3
breakdown [1] 4/15
broaden [1] 13/6
broadened [2] 6/4 9/9
broader [2] 6/17 6/18
Broward [4] 2/9 11/24 12/13 12/14
Bureau [2] 3/10 17/1

C
C.S [3] 10/24 11/3 11/6
calendar [4] 3/18 19/9 19/17 19/23
call [5]
Calling [1] 3/5
car [2] 7/1 7/4
carries [1] 7/2
cell [2] 14/8 14/10
certify [1] 20/20
Chapman [19]
Chapman's [1] 5/12
charge [9]

charged [6]
charges [3] 8/18 11/2 11/5
charging [2] 8/15 9/16
CHRISTOPHER [2] 1/9 3/6
Clematis [1] 2/5
close [1] 4/18
cocaine [3] 8/24 10/1 10/3
Code [2] 6/20 20/21
Coleman [4] 11/14 11/17 12/7 15/7
commission [1] 11/7
communications [1] 4/16
community [1] 5/12
computer [1] 1/24
concerned [1] 14/12
concerns [1] 15/18
concluded [1] 20/5
conduct [3] 16/14 17/25 18/3
confirm [1] 19/16
Congress [1] 12/24
Connors [3] 3/10 4/24 18/2
consideration [1] 16/11
conspiracy [9]
conspired [2] 7/4 7/5
conspiring [3] 4/18 5/10 5/16
continuance [1] 4/6
continuously [2] 16/22 17/3
convenience [1] 11/23
convenient [1] 12/16
conversations [1] 6/9
convicted [1] 8/7
counsel [4] 3/7 4/12 4/14 5/2
counsels [1] 3/9
count [27]
Count 1 [1] 5/24
Count 3 [1]
Count 6 [4] 10/20 10/23 11/2 11/12
Count 7 [2] 11/1 11/5
counts [4] 5/24 6/18 8/13 9/25
County [3] 11/12 11/18 11/25
court [8]
Court's [2] 4/9 14/22
courthouse [1] 12/18
courtroom [6]
CR [1] 1/4
created [1] 12/16
crime [2] 8/8 9/12
criminal [3] 3/5 8/25 17/25
CRR [2] 2/7 20/25
custody [1] 17/2

D
Dade [1] 11/25
data [3] 6/7 15/10 20/25
dates [3] 8/3 8/17 6/18
decided [1] 12/24
decision [1] 13/23
defendant [4] 1/10 2/5 4/1 5/4
defense [5]
defer [1] 4/12
deny [2] 18/1 19/6
difficult [1] 16/3
discuss [1] 18/6
discussed [1] 18/7
Discussion [1] 7/21
discussions [1] 7/8

22

D
dismiss [3] 13/10 13/17 13/22
district [6]
divide [1] 12/25
divided [1] 11/23
division [4] 1/3 11/24 11/24 11/25
divisions [2] 11/25 12/15
Docket [2] 7/20 7/22
drive [1] 12/23
drives [1] 7/1
duplicative [1] 9/18
duplicitous [1] 9/18
duplicity [1] 9/5

E
easier [2] 8/21 13/1
effect [1] 7/8
elsewhere [1] 13/7
engaged [1] 18/2
entitled [1] 20/23
Entry [2] 7/20 7/23
Entry 57 [1] 7/20
Esq [1] 2/5
essentially [1] 12/21
event [2] 8/16 13/6
events [1] 12/11
evidence [3] 8/20 14/4 18/2
exceeding [1] 8/6
exited [1] 4/24
expert [7]
explained [1] 14/16
Explosives [1] 3/11
extremely [1] 17/20

F
fact [3] 10/14 11/13 12/2
facts [1] 8/22
factual [1] 13/4
fast [1] 13/2
federal [6]
fees [2] 14/7 14/21
file [3] 10/7 13/21 17/16
filed [1] 4/1
fine [1] 4/10
firearm [19]
firearms [16]
fitting [1] 17/15
fishing [1] 13/16
FLORIDA [7]
folks [1] 18/3
foregoing [2] 18/1 20/21
FORT [3] 1/3 1/7 2/8
Francine [3] 2/7 20/24 20/25
frustrated [1] 6/12
frustration [1] 8/11
Ft. [3] 11/23 12/21 12/24
Ft. Pierce [3] 11/23 12/21 12/24
funds [1] 14/22

G
gonna [6]
government [13]
government's [1] 14/14
grand [4] 8/17 8/19 8/19 11/4

great [1] 5/13
grounds [5]
gun [2] 14/12 14/12
guns [2] 10/9 14/19

H
happy [1] 14/21
hates [1] 18/1
he'll [1] 14/16
hear [2] 5/8 14/8
hearing [2] 1/13 4/2
hereby [1] 20/20
high [1] 17/20
hire [1] 14/3
Hold [1] 9/1
Honor [16]
Honorable [1] 1/14
house [3] 8/14 9/17 9/24

I
I'll [9]
I'm [21]
I've [2] 4/11 14/16
idea [1] 11/17
Imagine [2] 9/21 9/23
impression [1] 5/23
imprisonment [1] 8/8
Improper [1] 13/22
In limine [1] 16/22
inappropriate [2] 7/8 10/5
incarcerated [3] 11/13 15/14 17/4
incidents [1] 11/13
inclined [1] 4/6
include [1] 6/16
Incorrect [1] 8/15
indictment [10]
ineffective [1] 4/19
information [1] 11/8
instructions [1] 4/9
interests [1] 5/14
intimidation [1] 10/24
investigation [1] 11/4
issue [9]
issues [2] 15/3 18/22

J
January [2] 13/15 13/18
John [2] 2/2 3/8
joining [1] 8/4
judge [5]
jurisdiction [1] 11/22
jury [6]

K
Key [2] 11/22 12/20
kick [1] 5/8
kilograms [2] 8/23 9/25
kilos [1] 10/2
knowing [1] 8/7
knowingly [1] 8/4

L
LAUDERDALE [3] 1/3 1/7 2/8
law [7]
lawyer [10]

lawyers [2] 12/17 12/22
legal [2] 10/12 12/1
light [2] 18/2 19/8
Lmine [1] 18/22
lines [1] 13/20
litigants [1] 12/16
locked [1] 5/2
log [1] 15/13

M
Makarov [1] 8/6
malicious [1] 17/19
marshals [1] 5/3
matter [3] 6/6 8/14 20/23
McMillan [9]
mean [3] 12/6 12/8 15/9
mechanical [1] 1/23
Miami [1] 12/19
millimeter [2] 8/6 8/7
misconduct [3] 16/12 17/6 17/13
Model [1] 8/5
Monday [1] 19/15
Monroe [1] 11/25
month [1] 4/9
months [1] 17/4
moot [2] 16/1 19/6
morning [1] 3/17
motion [15]
motions [2] 10/7 10/16 19/22
Mr. [31]
Mr. Chapman [18]
Mr. Chapman's [1] 5/12
Mr. McMillan [4] 3/21 4/24 5/6 19/2
Mr. Wilkins [9]
Mr. Wilkins' [1] 14/22
multiple [1] 10/8

N
north [1] 11/22
Number [2] 3/5 7/23
Number 18-80002-Criminal [1] 3/5
Number 57 [1] 7/23

O
October [2] 1/7 3/1
OCTOBER 15 [1] 3/1
offense [1] 11/7
offenses [1] 9/4
Office [1] 2/2
officer [2] 5/4 14/11
Official [2] 2/8 20/25
opposing [1] 4/12
order [3] 11/6 12/16 13/8
ordered [1] 4/25
original [1] 8/9

P
p.m [3] 1/8 3/1 20/5
Palm [13]
Pause [2] 8/2 10/22
peek [1] 19/11
pending [1] 18/22
penitentiary [1] 11/14
people [3] 8/22 12/19 12/22
percent [1] 17/21

23

P
perfectly [2] 5/15 8/21
person [5]
person A [3] 6/25 13/14 13/15
person B [1] 7/1
persuade [1] 11/8
persuaded [1] 5/17
pertaining [1] 16/13
phone [2] 14/8 14/10
pictures [1] 14/18
piece [1] 14/4
Pierce [3] 11/23 12/21 12/24
place [3] 12/12 17/7 17/14
Plaintiff [1] 1/7
point [1] 12/11
police [1] 14/11
position [2] 3/23 4/7
possess [6]
possessed [4] 8/5 9/11 9/15 9/23
possessing [1] 9/13
possession [7]
possibility [2] 4/15 8/15
practical [1] 19/14
preparing [1] 4/8
present [2] 3/15 13/2
prevailed [1] 17/9
prevailing [1] 18/4
prevent [2] 11/3 11/6
printout [1] 15/13
prison [1] 12/7
Prisons [1] 17/1
privy [1] 4/16
problem [1] 13/3
Procedure [1] 8/25
Procedure 12 [1] 8/25
proceed [1] 18/9
proceedings [5]
produced [1] 1/24
prosecution [2] 17/14 17/20
prosecutor [4] 16/12 16/23 17/23 19/5
prosecutorial [1] 17/13
providing [1] 11/8
puff [1] 7/16
pulling [1] 7/23
punishable [1] 8/8
purposes [1] 19/14
pursuant [1] 20/20

Q
question [2] 12/11 15/11
quote [1] 12/25

R
race [1] 17/24
raise [4] 13/5 13/16 17/8 17/16
raising [1] 16/12
read [1] 5/7
reading [2] 5/23 13/20
record [5]
recorded [1] 1/23
records [1] 15/7
reflect [2] 5/1 19/5
regular [1] 8/11
released [2] 16/25 17/2

remove [1] 3/19
replace [1] 4/13
Reporter [3] 2/7 2/8 20/25
reputation [1] 5/13
request [1] 15/13
resentenced [1] 16/13
resolve [2] 4/2 14/25
respond [1] 5/9
retain [1] 14/21
retired [1] 14/10
returned [1] 18/6
returns [1] 6/17
reviewed [1] 18/8
rights [1] 5/15
RKA [1] 1/4
RMR [2] 2/7 20/25
RMR-CRR [1] 20/25
rob [3] 6/25 7/3 7/4
robbery [2] 7/6 13/15
Ron [1] 3/14
Ronald [1] 2/5
Room [1] 2/9
Roy [1] 1/14
rule [2] 8/25 13/2
Russian [1] 8/6

S
Salopek [3] 2/7 20/24 20/25
Sara [1] 3/10
satisfactory [1] 15/20
scope [1] 13/9
sealed [2] 4/25 19/1
second [3] 4/1 9/1 19/13
Section [2] 6/20 20/20
Section 924 [1] 6/20
security [1] 5/4
sees [1] 4/14
semi [1] 8/6
semi-automatic [1] 8/6
send [1] 14/18
sense [4] 10/3 10/4 12/25 13/24
September [1] 9/4
sic [3] 3/17 5/25 18/11
simple [1] 6/24
situation [2] 15/6 15/8
six days [1] 17/2
sleeping [1] 17/10
Slim [1] 8/5
sneak [1] 19/11
South [1] 2/3
SOUTHERN [2] 1/2 11/21
Special [1] 3/10
staff [1] 5/4
standard [3] 5/25 17/17 17/19
state [1] 3/7
STATES [10]
stenography [1] 1/23
stop [1] 4/20
Street [1] 2/5
streets [1] 17/1
submit [1] 14/21
submitted [2] 3/18 18/8
substantial [1] 4/5
successfully [1] 16/22
suggest [2] 5/15 10/17

suggesting [1] 8/11
Suite [2] 2/3 2/6
Sumterville [1] 11/14
supersede [1] 8/16
superseded [1] 5/24
superseding [2] 8/2 7/17
system [2] 5/18 5/20

T
table [1] 3/10
talk [1] 7/18
talking [1] 11/8
Taurus [1] 8/5
technically [1] 11/22
tell [5]
ten kilograms [1] 8/23
term [1] 8/8
testifying [1] 14/3
thank [7]
think [11]
thought [1] 8/20
threaten [1] 11/5
threatening [1] 11/2
throwing [1] 8/22
time [11]
Title [1] 20/21
Tobacco [1] 3/11
TOVARRIS [2] 1/9 3/6
transcript [3] 1/13 1/23 20/22
trial [5]
trials [1] 12/23
true [3] 5/11 8/14 20/21
TUESDAY [3] 2/12 19/8 19/15

U
uhm [2] 15/8 16/10
understand [7]
UNITED [10]
untoward [1] 8/23
us [2] 8/25 12/25
USP [2] 11/14 15/7

V
venue [6]
vindictive [2] 17/14 17/19
vindictively [1] 16/25
visitation [2] 15/7 15/13
vs. [1] 3/6

W
waiting [2] 15/7 15/17
wake [1] 17/10
walking [1] 8/14
warn [1] 17/18
Wednesday [1] 19/16
week [2] 7/3 19/10
West [10]
whatsoever [1] 17/24
who's [1] 3/15
wife [1] 13/17
WILKINS [11]
Wilkins' [1] 14/22
willing [1] 13/21
withdraw [2] 15/22 15/24
withdrawn [1] 19/7

24

W
won [2] 16/21 18/22
work [1] 6/22
wrong [5]

Y
you'd [1] 12/21
yours [1] 12/2

*[Handwritten annotations across top: "Third Party Private Communication"]*

606

C. SWEETING - DIRECT/MC MILLAN

1  MR. MC MILLAN: Well, can you bring it back about
2  ten seconds, Special Agent Connors?
3  Okay. Please play it.
4  (Video playing)
5  BY MR. MC MILLAN:
6  Q. Okay. Your finger went out, did it not? Do you see that?
7  A. Play it back.
8  MR. MC MILLAN: And for the record, we're at
9  approximately 02:43.
10  (Video playing)
11  BY MR. MC MILLAN:
12  Q. Now, at this point, what has happened?
13  A. The associate gave him the bullets.  *[handwritten: FALSE]*
14  Q. Okay. And who actually grabbed the bullets out of the
15  case?
16  A. Christopher Wilkins.
17  Q. And --
18  MR. MC MILLAN: Special Agent Connors, can you please
19  rewind it back at 15 seconds?
20  (Video playing)
21  BY MR. MC MILLAN:
22  Q. And at 3:07:08 (sic), who is leaving with the box of  *[handwritten: FALSE]*
23  cartridges in their hand?
24  A. Christopher Wilkins.  *[handwritten: LIE]*
25  Q. And, Ms. Sweeting, is that, Government's Exhibit 78, the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

*[Handwritten annotations: "Exhibit B", "Ground II"]*

607

C. SWEETING - DIRECT/MC MILLAN

1  exact box of cartridges here in the courtroom here today?
2  A. Yes.
3  (Video playing)
4  MR. MC MILLAN: And for the record, we're at 3:34.
5  Can you freeze it for a moment, please, Special
6  Agent Connors?
7  BY MR. MC MILLAN:
8  Q. At this point, we -- are we outside again?
9  A. Yes.
10  Q. And there's one person walking far ahead of the other. Who
11  is this first person walking further ahead?
12  A. Christopher Wilkins.
13  Q. And who is the second person here?
14  A. Me.
15  Q. Who has the bag with the cartridges in it at this point?
16  A. Me.
17  Q. And why is that?
18  A. Because he didn't want to carry it outside.
19  Q. And why is Mr. Wilkins so far ahead of you when you walked
20  in together hand in hand?
21  A. Trying to get back to the car.  *[handwritten: Argument]*
22  Q. Okay. Well, he got what he wanted?
23  A. Yeah.
24  MR. MC MILLAN: Okay. Please continue, Special
25  Agent Connors.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

608

C. SWEETING - DIRECT/MC MILLAN

1  (Video playing)
2  THE COURT: Are we done with the video, Mr. McMillan?
3  MR. MC MILLAN: Yes, we are, your Honor.
4  THE COURT: Why don't we take our ten-minute
5  midmorning break?
6  COURTROOM SECURITY OFFICER: All rise.
7  (The jury exited the courtroom)
8  THE COURT: Ms. Sweeting, I'll remind you that you're
9  still under oath, and you are not permitted to discuss your
10  testimony with anyone. Okay?
11  Anything for me?
12  MR. MC MILLAN: No, your Honor.
13  MR. CHAPMAN: No, your Honor.
14  THE COURT: Ten minutes.
15  (The Judge exited the courtroom)
16  (Recess taken at 11:58 a.m. until 12:31 p.m.)
17  (The Judge entered the courtroom)
18  THE COURT: All right. Before we bring the jury in,
19  we have a preliminary jury note. So, we've got two questions
20  from one -- please be seated -- from one of the jurors.
21  In case you're wondering, the juror is Paula Thompson.
22  ROOM CLERK: Number 10.
23  THE COURT: She's Number 10. She sits in the back in
24  the center.
25  Question 1: From the 14 people (jury)," she

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

*[Handwritten annotations: "Juror #10 Amyee Cruz"]*

609

C. SWEETING - DIRECT/MC MILLAN

1  says, in parentheses -- "how many of us have to agree
2  on the same verdict (guilty or innocent) for the
3  defendant to be declared guilty or innocent?"
4  "Question 2: What does it mean 'guilty' in this
5  case? How many years of jail will be considered?
6  Minimum-maximum? (And most likely number of years if
7  the case is guilty)?"
8  Any proposals from the government?
9  MR. MC MILLAN: I think, your Honor, that I leave it
10  up to the Court as to whether the Court wishes to instruct the
11  jury now or say, "You'll find all that out at the closing
12  instructions." But the standard instructions cover both of
13  these issues very clearly. And I guess from the government's
14  perspective, I think that the answer would be that:
15  "We appreciate your question. It's a very good
16  question. And it will be addressed in the Court's
17  instructions to the jury at the end of the case."
18  Unless your Honor wishes to give them an instruction
19  in accordance with those instructions earlier.
20  THE COURT: Mr. Chapman?
21  MR. CHAPMAN: Judge, it sounds like she has -- at
22  least that juror has prejudged the case, if she's talking about
23  if we find him guilty --
24  THE COURT: Ah, she didn't say that. She said: How
25  many are required to find him guilty or innocent? So, it

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

610

C. SWEETING - DIRECT/MC MILLAN

1  sounds like she's open to both possibilities, in question 1.
2         And in question 2, I read this question as potentially
3  being favorable to the defense, but maybe I'm mistaken, because
4  she's concerned about the possibility of punishment, which
5  could cause to her to nullify, even if she were to find him
6  guilty, but you may have read that differently.
7         Go ahead.
8         MR. CHAPMAN: Judge, can you read the second question
9  again?
10        THE COURT: Yes. The second question, though, I think
11 it's important to note, comes after the first question, and
12 they're both written by the same person. So, I'll read both
13 again.
14        "Question 1: From the 14 people on the
15 jury (sic), how many of us have to agree on the same
16 verdict (guilty or innocent) for the defendant to be
17 declared guilty or innocent?"
18        And then the second question is:
19        "What does it mean 'guilty' in this case? How
20 many years of jail will be considered? Maximum --
21 sorry -- "minimum-maximum? (And most likely number of
22 years if the case is guilty)?"
23        MR. CHAPMAN: It really sounds as if they're already
24 discussing this case amongst --
25        THE COURT: Well, this juror actually mentioned --

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

611

C. SWEETING - DIRECT/MC MILLAN

1  spoke alone to Alan, my court security officer, outside the
2  presence of the other jurors. And Alan then instructed her:
3         "I'm not allowed to talk to you about this, but
4  put down whatever your question is in writing."
5         So, my understanding, based on that interaction, is
6  that this juror has done this on her own, based on the fact
7  that she's written it -- well, based on two facts. One, that
8  she waited until she was alone with Alan to begin asking the
9  question of Alan, and that Alan instructed her to put her
10 question down in writing, all outside the presence of the other
11 jurors. That's one.
12        And, two, then she specifically, at the top of this
13 note, which I didn't tell you in the first instance, she wrote
14 "Paula Thompson, participant number," and then she writes her
15 exact juror number, suggesting, again, very strongly, that this
16 is coming only from her and not from any of the other jurors.
17        MR. CHAPMAN: Your Honor, I would ask that she be
18 brought out and the Court question her as to whether or not
19 there are already discussions about Mr. Wilkins' guilt or
20 innocence with the other jurors.
21        THE COURT: I'm not going to do that, because there's
22 no evidence that there is, and I'm not going to begin injecting
23 my view to them that maybe that's something they should be
24 discussing, because it's not. And I don't find there's any
25 evidence, based on this note, that that's what the jurors are

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

612

C. SWEETING - DIRECT/MC MILLAN

1  doing. This is, as I said, a question from one individual
2  juror. Both of which, by the way, are easy answers covered by
3  the jury instructions. And what I'm happy to do is bring her
4  in, maybe on her own, and give her my answer to those two
5  questions, and instruct her again that she's not permitted to
6  prejudge the case, and she's not permitted to deliberate with
7  the other jurors about the case.
8         Any objection to that?
9         MR. MC MILLAN: Not by the government, your Honor.
10        MR. CHAPMAN: No, your Honor.
11        And, by the way, when I say "answer the question" --
12 let me just clear it with both of you -- the answer to
13 question 1 is:
14        "All of you. It must be unanimous."
15        And the answer to question 2 is:
16        "You may never, ever consider punishment as part
17 of your job. Punishment alone, if the defendant is
18 found guilty, is for the judge to decide, not for the
19 jurors."
20        Any objection to any of that?
21        MR. MC MILLAN: No, your Honor. Would the Court also
22 consider adding, though, that nobody knows what the punishment
23 will be at this time, because we don't.
24        THE COURT: I just -- I'm going to leave that out.
25 I'm just going to tell them:

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

613

C. SWEETING - DIRECT/MC MILLAN

1         "It's for me, and it has nothing to do with you."
2         Mr. Chapman?
3         MR. CHAPMAN: That's fine, Judge.
4         THE COURT: Why don't you bring in Juror Number 10?
5         (Juror Number 10 entered the courtroom)
6         THE COURT: Ms. Thompson, why don't you come up to the
7  lectern.
8         How are you, ma'am?
9         JUROR NO. 10: Good.
10        THE COURT: How are you?
11        JUROR NO. 10: Good, good.
12        THE COURT: I've received your two questions.
13        JUROR NO. 10: Yes.
14        THE COURT: Before I answer the questions, let me
15 instruct you again: It is very important that you not prejudge
16 the case. You are not permitted to decide whether you think
17 the defendant is guilty or not guilty until you've heard all of
18 the evidence in the case.
19        JUROR NO. 10: Of course.
20        THE COURT: Okay. And you followed that instruction?
21        JUROR NO. 10: Definitely.
22        THE COURT: Okay. Now, again, my second very
23 important instruction is: You are not -- and the other
24 jurors -- nobody is allowed to discuss with each other their
25 findings about the case, as I've instructed you before.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

614
C. SWEETING - DIRECT/MC MILLAN

1  JUROR NO. 10: Of course.
2  THE COURT: Or anything about the case until you begin
3  your deliberations at the end of the case.
4  JUROR NO. 10: Hum-hum.
5  THE COURT: And you followed that instruction?
6  JUROR NO. 10: Definitely, yes.
7  THE COURT: Okay. Great.
8  So, with all of that said, I don't think that you
9  should be discussing with them this note or my answers to the
10 note, okay?
11 JUROR NO. 10: Um-hum.
12 THE COURT: And you haven't, correct?
13 JUROR NO. 10: No, definitely not. It's just my
14 concern.
15 THE COURT: Great.
16 So, question number 1: How many of you would have to
17 agree one way the other? It has to be unanimous. You must all
18 agree. Okay?
19 JUROR NO. 10: Okay.
20 THE COURT: And then question number 2: Of course,
21 you haven't decided whether he is guilty or not guilty. If he
22 were to be found guilty, though, punishment is for the judge
23 alone to decide --
24 JUROR NO. 10: Okay.
25 THE COURT: -- not for the jurors. You'll never have

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

615
C. SWEETING - DIRECT/MC MILLAN

1  that as a consideration, you'll never be told about it, you
2  won't have to worry about it if you do find him guilty. Okay?
3  JUROR NO. 10: Okay.
4  THE COURT: All right. One less job for the jurors.
5  JUROR NO. 10: Okay, yep.
6  THE COURT: Does that answer your questions?
7  JUROR NO. 10: Well, it is what it is. Yes.
8  THE COURT: Okay. Thank you, ma'am.
9  JUROR NO. 10: Thank you.
10 THE COURT: And you could stay. We're going to bring [Suspicious]
11 in the rest of the jurors.
12 (The jury entered the courtroom) 13 - JURORS
13 THE COURT: Please be seated, folks.
14 Please proceed, Mr. McMillan.
15 MR. MC MILLAN: Thank you, your Honor.
16 BY MR. MC MILLAN:
17 Q. Now, Ms. Sweeting, I believe when we broke off, I asked you
18 about. -- when you were meeting with Christopher Wilkins, were
19 there occasions when he took physical possession of your gun?
20 A. Yes.
21 Q. And was it loaded at that time?
22 A. Yes.
23 Q. And were those on trips where he was either bringing drugs
24 to sell or going to buy drugs to sell?
25 A. We were going to pick them up.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

616
C. SWEETING - DIRECT/MC MILLAN

1  Q. Okay. So, he was armed at that point?
2  A. Yeah.
3  Q. And how do you know that?
4  A. Because it was my gun.
5  Q. Did you ever see the defendant with anything in his pocket
6  when he was going in to Paul's house?
7  A. No.
8  Q. Okay. But when you were driving with the drugs in the car,
9  was the gun there, your gun?
10 A. Yes.
11 Q. Now, approximately how many times during the period when
12 Mr. Wilkins got to the residential re-entry center on May 23rd
13 of 2017 and when he was gone for that period of time between
14 September 15th and September 22nd did you go to get drugs for
15 purchase -- for purposes of sale with the defendant?
16 A. Yes.
17 Q. Well, the question -- or the answer to that isn't a "yes"
18 or "no." It's how many times?
19 A. Like every time he was in the car with me.
20 Q. I'm sorry, I couldn't hear you.
21 A. Like every time he was in the car with me.
22 Q. And how often a week would that be?
23 A. Whenever he could come out of the halfway house.
24 Q. So, would that be every day, every other day, every
25 three days?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

617
C. SWEETING - DIRECT/MC MILLAN

1  A. Like every other day.
2  Q. Okay. So, every other day he would have access to your
3  gun, and he would buy drugs?
4  A. Yes.
5  Q. And were those drugs for his own use or to sell to other
6  people?
7  A. Sell to other people in the halfway house.
8  Q. How did you know that?
9  A. That's where he was, at the halfway house.
10 Q. Well, did you ever have any conversations with him about
11 that?
12 A. Yeah.
13 Q. What did he tell you about selling the drugs?
14 A. That he was selling the drugs in the halfway house.
15 Q. And was he making money doing that?
16 A. Yeah.
17 Q. Did the defendant have any other jobs or sources of income?
18 A. No.
19 Q. Was there occasions that you drove him -- well, for
20 example, when he picked up the ammunition at Walmart with you, [Lying]
21 that wasn't for your gun, was it?
22 A. No.
23 Q. Did he have the other gun with him on that day?
24 A. Yes.
25 Q. Did you ever see the defendant hide anything outside of the

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

618

C. SWEETING - DIRECT/MC MILLAN

1   residential re-entry center?
2   A. No. I just -- he would tell me he would hide it out there.
3   Q. Oh, so you didn't see it yourself.
4   A. No.
5   Q. But he told you that?
6   A. Yes.
7   Q. What did he tell you?
8   A. That he would hide it in the bush outside of the halfway
9   house.
10  Q. And when we're talking about "it," what are we speaking
11  about?
12  A. The gun.
13  Q. The gun?
14  A. Yes.
15  Q. Now, when we're talking about the gun, are we talking about
16  your gun or --
17  A. The other gun.
18  Q. -- the other gun?
19  A. The other gun.
20  Q. So, would there be occasions when he would both have the
21  other gun and the pistol that you had in your glove
22  compartment?
23  A. He never took my gun to the halfway house with him.
24  Q. Okay. But while he was travelling in the vehicle, did he
25  have access to two guns?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

619

C. SWEETING - DIRECT/MC MILLAN

1   A. Yes.
2   Q. Now, to your -- well, based on the statements to you, what
3   would he do with that other gun when he got to the halfway
4   house?
5   A. I don't -- like, he would put it in the bush. I don't know
6   where he would exactly put it at.
7   Q. Okay. Well, let's go through a trip to the residential
8   re-entry center, the Salvation Army.
9        Now, that's on Military Trail, isn't it?
10  A. Yes.
11  Q. And when you would drive him to this residential re-entry
12  center, where would you let him off?
13  A. On the side of the building of the halfway house, like in
14  the parking lot, like a piano place.
15  Q. Okay. Would you go through the gates or not?
16  A. No.
17  Q. Why not?
18  A. Because they couldn't see him get out my car. He wasn't
19  supposed to be in a car.
20  Q. Now, the piano place that you're talking about, is that a
21  business on Military Trail?
22  A. Yes.
23  Q. That is -- can you estimate the distance before the gate?
24  Is it a half block, a block?
25  A. It's not far from there, like, not even a half a block.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

620

C. SWEETING - DIRECT/MC MILLAN

1   Q. Okay. But outside the view of the gates themselves?
2   A. You could -- it's really close there.
3   Q. Okay. Now, with respect to the, uhm, the photographs you
4   took, did you take those with your camera?
5   A. Yes.
6   Q. Okay. And when I say "photographs," they were actually
7   videos, were they not?
8   A. Yes.
9   Q. Why did you take those videos?
10  A. I just took them. Because I was mad at -- I just wanted to
11  take them.
12  Q. Now, at that point in time, you were actively dating
13  Christopher Wilkins?
14  A. Yes.
15  Q. And he was all yours as far as you knew.
16  A. Yes.
17       MR. MC MILLAN: May I approach the witness, your
18  Honor?
19       THE COURT: You may.
20  BY MR. MC MILLAN:
21  Q. Ms. Sweeting, I'd like to go and show you what I've marked
22  for identification as Government's Exhibits 73, 74, 75, and 76.
23  Do you recognize all these photographs by your initials?
24       (Government's Exhibit Numbers 73, 74, 75, and 76
25  marked for identification)

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

621

C. SWEETING - DIRECT/MC MILLAN

1   A. Yes.
2   Q. Are those fair and accurate photographs or representations
3   of what you saw on the day those individual pictures were
4   taken?
5   A. Yes.
6        MR. MC MILLAN: Your Honor, at this time, I'd move for
7   the admission of Government's Exhibits 73, 74, 75, and 76.
8        THE COURT: Any objection?
9        MR. CHAPMAN: As to date, objection as to date.
10       THE COURT: Why is there an objection as to date?
11       MR. CHAPMAN: Because it's part of the superseding
12  indictment.
13       THE COURT: Overruled.
14       MR. MC MILLAN: May the exhibits be admitted then,
15  your Honor?
16       THE COURT: Seventy-three, 74, 75, and 76 will be
17  admitted.
18       (Government's Exhibit Numbers 73, 74, 75, and 76
19  admitted into evidence)
20  BY MR. MC MILLAN:
21  Q. Now, with respect to these images, these are still images
22  taken from videotapes, is that correct?
23  A. Yes.
24  Q. Did you have -- or I should say digital imagery --
25  videotapes no longer really being in existence, but did you

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

*I got 18-years for her firearm & Ammunition Found this Day in her Home 6/25/18*

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

*Ground III*

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| WILKINS, Christopher | 764055-18-0004 | 18 |

*Multiplicity*

*Exhibit C*

For more stamps a...

**SUMMARY OF EVENT:** *Gun & Ammunition Found In Same Location June 25, 2018 — I Was Already In Fed Prison 9½-months as of September 23th, 2017*

Search warrant at 921 Foresteria Drive Apartment #3, Lake Park FL

**NARRATIVE:**

1. On June 25, 2018, S/A Sara Connors obtained a search warrant for 921 Foresteria Drive Apartment #3. 921 Foresteria Drive Apartment #3 is a two bedroom residence on a residential street in Lake Park, FL. At approximately 6:45 a.m., ATF Agents and Task Force Officers approached the door of the residence. S/A Finnamore was on the entry team for the search of the residence. S/A Finnamore knocked and announced police with a search warrant multiple times, and the door was not answered. At this time, agents made entry into the residence using a key given to agents by the homeowner and subsequently escorted four young children out of the residence, the residence was then secured by agents. Agents provided the children chairs to sit on and the children who were not residents were given the opportunity to call their parents and arrange for pickup, those children were subsequently picked up by family members. The children of Crystal SWEETING were turned over to Debbie Sweeting, Crystal SWEETING's mother.

2. Before the search began, SA Trenschel conducted a video recording of the residence. After the video was complete, agents entered the residence to begin the search. S/A Finnamore was tasked with the evidence log, to view all evidence as it was collected and write it down for the search warrant return and an inventory to be left at the residence. For the purposes of the log, S/A Finnamore noted BEDROOM 1, the (northeast) bedroom, (later determined to be Crystal SWEETING's bedroom) and BEDROOM 2 (the northwest) bedroom.

3. S/A Connors directed the agents to pair up and begin to search rooms. S/A Trenschel was tasked with photographing the evidence.

4. S/A Finnamore entered "BEDROOM 1" with TFO Casey Goetz and began the search. During the search of the closet in BEDROOM 1 for cellular devices, a firearm was found, identified as a Taurus PT709 Slim 9mm Pistol loaded with 9mm ammunition. Agents also found a white Winchester ammunition box containing 50 rounds of Winchester 9mm ammunition. Agents immediately called for S/A Connors who due to firearms and ammunition not being listed on the initial search warrant, applied for a supplemental search warrant for the firearm and ammunition. The residence was held by agents until the search warrant for the firearm and ammunition was signed. The firearm and ammunition was then recovered by agents.

| Prepared by: Mark B. Finnamore | Title: Special Agent, West Palm Beach Field Office | Signature: | Date: 06/28/ |
|---|---|---|---|
| Authorized by: Robert W. SHIRLEY III | Title: Resident Agent in Charge, West Palm Beach Field Office | Signature: | Date: 06/28/ |
| Second level reviewer (optional): Christopher A. Robinson | Title: Assistant Special Agent in Charge, Miami Field Division | Signature: | Date: |

00033

| Title of Investigation: WILKINS, Christopher | Investigation Number: 764055-...004 | Report Number: 18 |
|---|---|---|

5. After the firearm was recovered in BEDROOM 1, agents continued to photograph evidence and search the residence. For a complete review of the items seized from the residence, refer to the inventory log, which is attached to this report.

6. Jail Correspondence from Christopher WILKINS was found in BEDROOM 1 as well.

7. From BEDROOM 1, a laptop and multiple cellphones were recovered in the closet. Additional cellphones were recovered in the dresser along with two flash drives.

8. From BEDROOM 2, additional media devices were discovered including two tablets, and multiple cellphones.

9. From BEDROOM 1, (Crystal SWEETING's bedroom) the following items were recovered:

- Taurus PT709 Slim 9mm Pistol containing 9mm ammunition in a black pistol case
- A white Winchester ammunition box containing (50) rounds of Winchester 9mm ammunition
- Two Silver Flash drives
- Silver ANS Cellular Phone
- Black Kyocera Cellular Phone
- Black ZTE Cellular Phone
- Black Alcatel Cellular Phone
- Black Samsung Cellular Phone
- White Samsung Cellular Phone
- One HP pink Laptop
- Jail Correspondence from Christopher WILKINS

10. From the BEDROOM 2 (Children's bedroom), the following items were recovered:

- Two Black Samsung Tablets
- Black HTC Cellular Phone
- White IPhone Cellular Phone

11. At the completion of the search, SA Finnamore took a video of the residence. Before agents left the residence, agents locked the residence and left the key to the apartment with Debbie Sweeting, Crystal SWEETING's mother. A copy of the 2 warrants and evidence logs were left on the kitchen counter of the residence.

De 188  DE#184  Filed 11/15/2019  *Ineffective Assistance*
DE#140  Filed 11/25/2019  mental health
Crystal Sweeting

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 19-80032-CR-RKA

UNITED STATES OF AMERICA,
         Plaintiff,           Fort Lauderdale, Florida
    v.                        December 18, 2019
CHRISTOPHER TOVARRIS WILKINS,  1:33 p.m.
         Defendant.
```

Transcript of Motion Hearing had before the Honorable Roy K. Altman, United States District Judge.

Ground VII

Exhibit D

Ineffective Assistance Failure to Raise mental Health Crystal Sweeting

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

APPEARANCES:

For the Government:   John C. McMillan
                      United States Attorney's Office
                      500 South Australian Avenue
                      Suite 400
                      West Palm Beach, Florida 33401

For the Defendant:    Ronald S. Chapman, Esq.
                      400 Clematis Street
                      Suite 206
                      West Palm Beach, Florida 33401

Court Reporter:       Francine C. Salopek, RMR, CRR
                      Official Court Reporter
                      United States District Court
                      299 E. Broward Blvd., Room 207B
                      Fort Lauderdale, Florida 33301
                      (954)769-5686

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

WEDNESDAY, DECEMBER 18, 2019, 1:33 P.M.

(The Judge entered the courtroom)

THE COURT: Good afternoon. Please be seated.

MR. MC MILLAN: Good afternoon, your Honor.

ROOM CLERK: Calling Case 19-Criminal-80032, United States of America vs. Christopher Tovarris Wilkins.

Counsel, please state your appearances for the record.

MR. MC MILLAN: Good afternoon, your Honor. John McMillan on behalf of the United States. With me at counsel's table is Special Agent Sara Connors of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

AGENT CONNORS: Good afternoon, your Honor.

THE COURT: Good afternoon to the both of you.

MR. CHAPMAN: Good afternoon, your Honor. Ron Chapman for Mr. Wilkins, who's also present.

THE COURT: Good afternoon to you.

Good afternoon, Mr. Wilkins.

THE DEFENDANT: Good afternoon.

THE COURT: All right. We're here for a couple of things. Mr. Wilkins has filed two motions.

Where's -- I think I misplaced -- you know what, give me a moment. I apologize.

(Discussion had off the record between room clerk and the Court)

(Pause)

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

---

THE COURT: Thanks.

(Pause)

THE COURT: All right. We're here for a couple of reasons. The first is that there's a motion to withdraw counsel for ineffective assistance of counsel and a separate motion to withdraw the government-appointed CJA counsel and to proceed pro se.

There are two motions. They request the same relief, but in one he says that Mr. Chapman was ineffective, and the other he says he wants to proceed pro se, which, of course, he's entitled to do.

I also wanted to, since I wasn't the judge who was here at the time that the verdict was read, and since it's my understanding that a number of things transpired at the reading of the verdict, I wanted to inform myself of what had happened, both with the audio and the video.

But in fairness to you, Mr. Wilkins, I didn't want to view any of that evidence without you present. I didn't want any argument that I was secretly reviewing evidence that you weren't a part of or that you didn't know I was reviewing. And so, in order to alleviate any future concern you might have about that, I wanted to bring everybody in together so that we could all view it and listen to it together. And that way, there can be no argument.

And I'll just state for the record that I have not

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

5

1  viewed or listened to any of the recordings related to that
2  incident.
3          So, first things first. Let's play the video and the
4  audio, and then -- how long is it, do we know?
5          MR. MC MILLAN: Your Honor, it depends upon whether
6  you're watching the entirety of it or you just cut to the main
7  portion. It's approximately five minutes total, and the
8  actual -- maybe a little less than that, and the actual
9  incident itself is probably five seconds.
10         THE COURT: Oh, okay. All right. Well, then maybe we
11 can just watch the last couple minutes of it, then.
12         (Discussion had off the record between room clerk and
13 court reporter)
14         ROOM CLERK: Are you ready?
15         THE COURT: I'm ready.
16         (Video and audio playing)
17         THE COURT: Hold on. Let's ignore the audio for now,
18 and then we play it after.
19         (Video playing)
20         THE COURT: All right. Why don't we play the audio.
21         (The audio is playing from "this is going to conclude
22 your jury service for the two-week period")
23         THE COURT: Is there more?
24         (Discussion had off the record between the Court and
25 court reporter)

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

6

1          THE COURT: All right. So, now that we've viewed the
2  video and listened to the audio of the incident, let's take up
3  Mr. Wilkins' motions.
4          I'll ask the government to please step out, and I will
5  clear the courtroom.
6          (Government counsel and the public exited the
7  courtroom)
8          (The following proceedings were ordered sealed by the
9  Court:)

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

7
SEALED PROCEEDINGS

1          THE COURT: All right. The record will reflect that
2  the courtroom has been sealed. I'm here with the
3  U.S. marshals, my court security officer, and my court
4  reporter, and my courtroom deputy, and myself, along with
5  Mr. Chapman and Mr. Wilkins alone. The courtroom has otherwise
6  been cleared.
7          Mr. Wilkins, let me hear from you, then, about why you
8  want to go pro se. And that's your right, by the way, if you
9  choose to. Let me hear about that.
10         THE DEFENDANT: Okay. I filed a motion -- I filed two
11 motions in regards to ineffective assistance and pro se motion
12 as well. I raised these issues prior to this situation
13 numerous of times. At one point, I withdrew my motion to
14 withdraw counsel on ineffective assistance, as far as my motion
15 pertaining to the issue, because I was promised certain things
16 about my attorney. That's why I withdrew it.
17         Now, the reason I'm filing this motion now is because
18 I told you once before, in docket -- I want to say Docket 35
19 and Docket 36, that I had been having issues with my attorney
20 prior to leading up to trial. He would not file any pretrial
21 motions. He continuously said everything is not with merit.
22 For some reason, he just don't want to put nothing on the
23 docket for my appealing purposes in the future. If it gets
24 denied, I rather it get denied up -- granted, I still want it
25 on record. He refused to do that totally. Okay?

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

8
SEALED PROCEEDINGS

1          October 22nd, we went -- we had -- I mean
2  October 15th, we had a hearing in regards to my motion to
3  withdraw counsel. You specifically told my attorney if he need
4  a firearm expert, I will give you the funds for that. Am I
5  correct?
6          THE COURT: I'm not here to answer your questions.
7          THE DEFENDANT: Okay.
8          THE COURT: Just tell me what you --
9          THE DEFENDANT: You gave him permission to get funds
10 for a firearm expert, which is Michael Knox from Tallahassee,
11 Florida. He contacted Michael Knox. Michael Knox said it
12 appears not to be the same exact firearm, that you can convince
13 the jury otherwise that it's not the same firearm.
14         THE COURT: Isn't that the firearm that you were
15 acquitted on?
16         THE DEFENDANT: No. It was the firearm that I was
17 convicted on. Someone else (sic) firearm I got convicted for.
18 That was seized in someone else home while I was in prison.
19         Now, I tell Mr. Chapman to have the expert to come to
20 court to testify, like you ordered. You ordered that I get a
21 firearm expert. I was expecting him to come. He didn't
22 testify. He didn't notify him. But I got a report from him
23 saying that this is not -- this does not appear to be the same
24 firearm that the government have in their possession and
25 charged Mr. Wilkins with. He didn't use him as my witness.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

                                              17
                          SEALED PROCEEDINGS

1   done, tried to put that piece of evidence in again, and I
2   likely would have had a different view of the relevance of that
3   piece of evidence now that the sister had, in fact, testified.
4   So, I find that there's no need even to discuss the question of
5   whether it would have made a difference.
6           First of all, let me say that in light of the
7   proffered testimony of the sister, that it seems irrelevant now
8   in light of the fact that the government didn't present the
9   photographs. But even if the government had presented the
10  photographs, the cost of calling the sister in light of my
11  ruling on the motion in limine, and the likely effects to that
12  ruling of having her come into court and testify, so outweighed
13  any possible marginal benefit that might have been gleaned from
14  her testimony that I can't fault Mr. Chapman for making that
15  strategic call either.
16          What about the motion to recuse me from -- well, I'm
17  not sure it's to recuse me -- I guess it's the motion to recuse
18  Judge Dimitrouleas from taking the verdict? What about that?
19          MR. CHAPMAN: My recollection of when the Court
20  mentioned that you were considering leaving because of your
21  wife's medical situation, that I -- in fact, I asked the Court
22  if I could discuss it with Mr. Wilkins, and I think I asked the
23  Court, in the event that something arose that required a more
24  nuanced view to answer the jurors' questions than what
25  Judge Dimitrouleas might have, because he didn't sit through

          FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                        (954)769-5686

                                              18
                          SEALED PROCEEDINGS

1   the trial, would it be all right if we called you, and you said
2   it would be. So, then I discussed that with Mr. Wilkins and
3   said I thought that we could do it that way. And there was no
4   objection from Mr. Wilkins.
5           THE COURT: And that's exactly my recollection. And
6   I'll just state for the record that I had my phone on me the
7   whole time. Obviously, when the verdict came out, I was called
8   by Judge Dimitrouleas to notify me, along with my staff, and I
9   easily could have been called had there been a nuanced question
10  of any kind relating to any of the substantive issues in the
11  case. But to my recollection, no such issue arose after I
12  left, correct?
13          MR. CHAPMAN: There were several questions that
14  arose -- the jurors had several questions, including that they
15  were deadlocked and all, but --
16          THE COURT: But no substantive questions on the case.
17          MR. CHAPMAN: No, not that I recall.
18          THE COURT: That's my recollection. There were no
19  substantive questions on the case. Had there been substantive
20  questions, as I told the parties, Judge Dimitrouleas would have
21  called me, and I would have come on to the phone, on the
22  record, with the parties present in order to try to answer that
23  question as best as I could with the parties' help, as I always
24  do.
25          But nevertheless, it's irrelevant, because there was

          FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                        (954)769-5686

*[handwritten annotation: mental Health]*

                                              19
                          SEALED PROCEEDINGS

1   no such substantive question. And I take you, Mr. Chapman, to
2   mean that when you -- and I remember giving you the opportunity
3   to mention that possibility to Mr. Wilkins and seeing if he had
4   any objection. I remember that no objection was raised at that
5   time. So, I find that that's not a reason for any relief.
6           What about the question of all these other calls
7   involving Crystal Sweeting where she mentioned that she had
8   suicidal thoughts, and also, I guess, other calls that he
9   thinks might have constituted Brady?
10          MR. CHAPMAN: There -- Mr. Wilkins did mention that
11  many times, about how the fact that she had mentioned she was
12  suicidal. I remember looking at the transcript of that call,
13  and she didn't say why she was suicidal. And my concern was
14  that if I questioned her about that, she would say, "Of course
15  I was suicidal, Chris was constantly calling me from the jail,
16  and it was driving me crazy." So, instead, I -- I'm sure the
17  Court remembers --
18          THE DEFENDANT: That's not how the --
19          THE COURT: You're not allowed to speak when he is
20  speaking. He didn't interrupt when you were speaking.
21          THE DEFENDANT: I ain't finished.
22          THE COURT: You were finished when I said that I
23  wanted to hear from Mr. Chapman. And it was Mr. Chapman's turn
24  to talk. And you'll have a chance to respond. But you cannot
25  interrupt Mr. Chapman. Is that understood?

          FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                        (954)769-5686

                                              20
                          SEALED PROCEEDINGS

1           THE DEFENDANT: Yes, sir.
2           THE COURT: Go ahead, Mr. Chapman.
3           MR. CHAPMAN: So, there were several -- many times
4   when I impeached Ms. Sweeting with her transcript. In fact, I
5   think at one point -- I don't know if it was Ms. Sweeting or
6   someone else -- you asked me if I had a separate copy for her,
7   because I was going up there so much. And what I always wanted
8   to have was that if she gave me an answer that I didn't
9   believe, that I could impeach her with the transcript.
10          The particular call that Mr. Wilkins was pointing out,
11  I didn't think that I could impeach her. It was too broad,
12  these statements that "I'm upset, I'm suicidal," as to why.
13          And the point was, even she many times referred to
14  Special Agent Connors as, I believe, "that bitch," that pointed
15  out how upset she was that the government was pressuring her to
16  testify in this case. There was plenty of evidence about that,
17  without giving her the opportunity to say something like, "Yes,
18  I was suicidal because of what Chris was doing." It was
19  abundantly evident that she was pressured, by her own
20  statements. And then, if she had denied that, I have the
21  transcript to impeach her. But I wasn't going to ask a
22  wide-open question like that, where I don't have basically
23  ammunition to impeach her with, when I've already done it with
24  other portions of the transcript. It just wasn't --
25          THE COURT: Go ahead, Mr. Wilkins.

          FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
                        (954)769-5686

1  THE DEFENDANT: My response to that is, it doesn't
2  matter what he was insinuating it for as to impeachment. She
3  have a mental disability. Part of *Brady*, I'm supposed to have
4  all documentation pertaining to that. That was missing in my
5  discovery.
6  Not only that, a week from trial, she checked into a
7  mental hospital to commit suicide (sic). So, the thing that --
8  what I'm looking under, *Brady vs. Maryland*, I'm supposed to
9  have all discovery pertaining to mental health, mental illness,
10 pertaining to individuals far as a witness. She's the star
11 witness. Why wasn't that in my discovery? But a small portion
12 of it was in my discovery, and when I told him to contact the
13 government in regards to that, he never did it.
14 THE COURT: Let me ask you. You said you've seen this
15 call and the transcript, so it sounds like you did have it.
16 MR. CHAPMAN: The particular call that Mr. Wilkins was
17 referring to, yes, I did see that.
18 THE COURT: So, what do you mean you didn't have it in
19 discovery? If your lawyer and you are going over it, how do
20 you not have it?
21 THE DEFENDANT: Because I told him -- we have the
22 transcript when she said it. Last year, February, she said it
23 over the phone that the government, Sara Connors and them, are
24 pressuring her, that she feels like she wants to commit
25 suicide.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

1  THE COURT: Okay.
2  THE DEFENDANT: Now, when they played the phone
3  conversations in trial, they didn't play that specific call.
4  But during trial, I kept telling him --
5  THE COURT: Ah. Okay. One second. You're now
6  talking about two different concepts. One is
7  *Brady vs. Maryland* --
8  THE DEFENDANT: Right.
9  THE COURT: -- requires that you get it.
10 THE DEFENDANT: Right.
11 THE COURT: They satisfied *Brady* by giving it to you.
12 You had it.
13 The government doesn't have to at trial play all of
14 the evidence that they're required to disclose to you under
15 *Brady*. They can play whatever they want.
16 THE DEFENDANT: Right. I understand that.
17 THE COURT: So, there's no *Brady* violation.
18 What there may be is, there may be ineffective
19 assistance of your counsel in failing to elicit or play that
20 particular call.
21 THE DEFENDANT: Right.
22 THE COURT: But I find that there is no such
23 ineffectiveness on the part of your counsel for refusing to
24 play that call, because it's an obvious strategic call, and
25 not, in any event, unreasonable in my view.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

1  First of all, to question a female witness in a case
2  involving a male defendant who's alleged to have threatened her
3  and oppressed her, in some ways, over and over again in front
4  of a jury that involved both men and women, to try to blame her
5  and make her seem crazy because of her suicidal thoughts, seems
6  to me a very poor idea.
7  In any event, it was an idea that clearly could have
8  backfired in a number of ways. One of which is, the jurors
9  would just find it distasteful that you and your lawyer were
10 bringing out all this very dirty laundry with respect to her
11 personal mental state.
12 Second, and more importantly, that it gave her the
13 opportunity, as Mr. Chapman said, to come back with, Of course,
14 I'm suicidal. Look at this guy that I'm dealing with and all
15 the horrible things he's saying to me. And let me point you
16 back to this text message where he told me to go get a black
17 dress for my own funeral and called me a hoe, and all these
18 other horrible things he said to me, who wouldn't be suicidal
19 under those circumstances?
20 Instead, it seemed a much better strategy to do as
21 Mr. Chapman did, which was to stick to all the facts he could
22 always impeach her on. And, frankly, he did a tremendous job
23 of having one question, she denied it, or she couldn't
24 remember, and he always had the exact citation ready in a
25 previous transcript to come back to her and impeach her with

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

1  it.
2  And it wasn't unreasonable -- and this is the third
3  point -- to think, given all of that impeachment evidence, that
4  was clearly proven, of situations where she was either changing
5  her story or not remembering the story, to refuse to impeach
6  her with something where he didn't -- excuse me -- refuse to
7  question her with something that he didn't then have a backup
8  impeachment cite to go to. In other words, with so many of the
9  other impeachment moments, when she said X, Y, or Z, he would
10 say, Well, here's someplace where you said not X, Y, or Z.
11 Great impeachment.
12 With this one, if she had said, "I was suicidal
13 because of Mr. Wilkins and all the things he's done to me," he
14 had nothing to fall back to, to impeach her with that. And it
15 wasn't unreasonable to refuse to get into that.
16 So, there was no *Brady* violation, and I don't think
17 there was any ineffective assistance of counsel in this
18 strategic call.
19 What else was there? He said there were a number of
20 pretrial motions that he wanted you to file, which he had
21 documented in Docket Entry 35 and 36. But I recall that we had
22 a hearing in October on all of those. I went through each of
23 them and found that each of his requested forms of relief were
24 totally either frivolous or unviable under the circumstances.
25 You explained that you had expressed that exact view to him.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954) 769-5686

1  Here I am, the judge, basically stating that view in reviewing
2  it.
3       And then Mr. Wilkins voluntarily withdrew the motion
4  as opposed to having -- which I gave him the opportunity.  I
5  said, Look, I'm going to strike the motion, because it's pro se
6  in a situation where you've got a lawyer.  But if you want, you
7  could either file it through your lawyer, if he thinks it's
8  viable, or you can do it -- go on your own.  And he chose to
9  keep you as his lawyer and to withdraw his motion.  That's my
10 recollection.
11      MR. CHAPMAN:  Well, we had some substantive motions on
12 the 404(b) evidence that the government sought to introduce,
13 and then I responded --
14      THE COURT:  And I think I excluded almost all of it.
15      MR. CHAPMAN:  Yes.
16      THE COURT:  In fact, the only one that I can remember
17 clearly that I was going to allow in, after all the different
18 things that I excluded, was this question of whether -- what
19 was the man's name who came and testified?
20      MR. CHAPMAN:  Uhm --
21      THE COURT:  Anyway, the coconspirator, whether he, who
22 had known the defendant since 2005 as a drug dealer, was going
23 to be allowed to say he had known him as a drug dealer since
24 2005.  I left that open.  The government ended up withdrawing
25 that request, and that ended up never even coming into

1  evidence.  So, at least most of your motion in limine to
2  exclude all the 404(b), a pretrial motion, was granted on
3  behalf of Mr. Wilkins, if not all of it.  I don't remember
4  exactly as we sit here today.  I think I granted almost all of
5  it, if not all of it.  So, that's true.
6       You also filed a motion in limine of your own, much of
7  which was granted, as I recall, correct?
8       MR. CHAPMAN:  Correct.
9       THE COURT:  What are these other pretrial motions that
10 he told you to file that you didn't file?
11      MR. CHAPMAN:  Judge, there were --
12      THE COURT:  Or is it the same things that were
13 documented in 35 and 36?
14      MR. CHAPMAN:  I'd have to go back and look at 35 and
15 36.  I -- there were many things that Mr. Wilkins asked me to
16 file motions on.  On every one of those issues, I researched
17 them, such as --
18      THE COURT:  Duplicity of counts, the multiple guns in
19 one count.
20      MR. CHAPMAN:  Right.
21      THE COURT:  Excuse me.  The guns in different counts.
22      MR. CHAPMAN:  And I was almost getting frustrated to
23 the point as to how much time I was spending on that, only to
24 realize that there was no good-faith basis to file that.
25 Mr. Wilkins never wanted to hear anything about a good-faith

1  basis.  If he had the idea, it had to be filed, whether or not
2  there was a good-faith basis for filing it or not.
3       But I researched many, many issues, to the point where
4  I thought my time is so much better spent on preparing
5  cross-examinations and other things, that I wish I had had more
6  time.  But I wanted to research those issues, because maybe
7  Mr. Wilkins was right.  And anything that I thought he was
8  right on, I did file those motions.
9       But the 404(b) motion, as I recall, was really my
10 idea.  That was not one that he ever really pressed until I
11 raised it.
12      THE COURT:  Let me say that, on page 2 of the first
13 motion to withdraw counsel, Mr. Wilkins lays out all of the --
14 what he calls ground 2, and ground 1, which to my recollection
15 reraised the issues we talked about in Docket Entry 35 and 36
16 at the hearing in October, all of which are completely
17 frivolous motions.  The idea that he wasn't -- there's an
18 improper venue, because he was not in Palm Beach; the notion
19 that the guns -- there was a double jeopardy violation
20 involving multiplicity in charging the same offense in more
21 than one count.  In fact, that's not at all what happened, as
22 we saw at trial.  He was charged with different guns in
23 different counts.
24      The idea to split Counts 6 and 7 under Rule of
25 Criminal Procedure 12.  I'll just say, we've dealt with all of

1  this.  Mr. Wilkins in open court voluntarily withdrew that
2  motion, so the attorney can't be blamed for not filing it in
3  any event.  But even had Mr. Wilkins not withdrawn the
4  motion -- which, of course, is not what happened -- but even if
5  he had not withdrawn the motion and had insisted upon it, all
6  of these things, as we discussed at that hearing, have no
7  good-faith basis.  And so, no lawyer, who's an officer of the
8  Court, is required to do them just because their client
9  believes that they should be filed.
10      So, I find no fault with respect to any of those
11 issues.
12      Ground 4, that it was the government's duty to make a
13 plea offer, there's no such law, and he cites no such law.
14      Also, ground 4, this prosecution was vindictive and
15 racially motivated.  I watched the evidence.  The evidence of
16 Mr. Wilkins' guilt, irrespective of his race, was overwhelming.
17 It had nothing to do with race.  It had everything to do with
18 Mr. Wilkins' decision to engage in a life of crime.
19      Ground 5, that raises the Knox firearm expert issue,
20 which we've addressed.
21      Ground 6, Mr. McMillan violated your Fourteenth
22 Amendment rights, because there was exculpatory video evidence
23 that was withheld until the day of trial.
24      MR. CHAPMAN:  I don't know what that is.
25      THE COURT:  He says he told you to file a motion for a

29
SEALED PROCEEDINGS

1  mistrial as a result of that, and that you refused.  Do you
2  have any recollection of that?
3           MR. CHAPMAN:  No.  I don't even know what video we're
4  talking about there.
5           THE COURT:  What video are you talking about there?
6           THE DEFENDANT:  I'm talking about the original Walmart
7  video that I never saw.  I saw the edited version.  I never saw
8  the original Walmart video.
9           The jurors had a problem with the video working inside
10 of the deliberation room to that video.  I never saw it.  I saw
11 the chopped and true video during trial.
12          THE COURT:  The chopped video, the one that was
13 edited.
14          THE DEFENDANT:  Right.  I never saw the original.
15          THE COURT:  Well, I think the testimony was there was
16 only the edited video.
17          THE DEFENDANT:  Nah, it was original.
18          THE COURT:  Where was the original?
19          THE DEFENDANT:  The jurors asked for the original.
20 They gave them the original I never got to see.
21          THE COURT:  When was that?
22          THE DEFENDANT:  During the trial.  During
23 deliberations, when the video couldn't work in the computer,
24 the jurors sent the computer back out, saying that they
25 couldn't go in there.  That's when the government sent their

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

30
SEALED PROCEEDINGS

1  computer back there --
2           THE COURT:  Ah, that reminds me of that issue.  The
3  government computer is a blank computer.  The government
4  computer is a wiped computer that's used in every case.  I
5  checked with both sides to make sure there was no objection --
6           THE DEFENDANT:  I objected.
7           THE COURT:  -- to the jurors being able to play the
8  videos on a blank computer, that was properly wiped.  And
9  there's no evidence of any kind that the jurors were able to
10 access something they weren't supposed to access on the
11 computer in the jury room.
12          I'm not even sure if there's Internet access back
13 there, but I do know that we take their cell phones away.  And
14 so, there's simply no evidence that anything untoward happened
15 with that video playing.
16          The video that you're talking about that was unedited,
17 we can ask Mr. McMillan about it, because, to be honest, I
18 don't have a proper recollection of this incident.  So, when he
19 comes back, I'm going to ask him about.  Please, if I forget,
20 please remind me.
21          And that, anyway, doesn't involve your lawyer so much
22 as it involves -- I guess it involves your lawyer a little --
23          THE DEFENDANT:  It does.
24          THE COURT:  -- but it also involves Mr. McMillan
25 violating your Fourteenth Amendment rights.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

31
SEALED PROCEEDINGS

1           Ground 7, there was no authentication for any of the
2  evidence.  I, of course, admitted all that evidence because it
3  was properly introduced pursuant to the rules of evidence.  So,
4  ground 7 has no merit.
5           Ground 8 involves this jail call with Crystal
6  Sweeting, which we've discussed.
7           Ground 10 says the videos weren't properly
8  authenticated.  Of course, they were.
9           Ground 11, no Walmart employer from the surveillance
10 equipment staff or the company staff testified to authenticate
11 the recordings that the equipment had not been altered or
12 manipulated at all.
13          How did that come in?  Remind me.
14          We'll ask Mr. McMillan.
15          MR. CHAPMAN:  I don't remember which witness that was.
16          THE COURT:  Anyway, I -- we'll go back through the
17 transcript, of course, but certainly I would not have allowed
18 evidence in unless it was properly authenticated.
19          MR. CHAPMAN:  I think it was authenticated through
20 Ms. Sweeting when she looked at it.
21          THE COURT:  That's right.  Of course.
22          So, Mr. Wilkins, you don't need a Walmart person to
23 come in and authenticate the video itself.  All that's
24 necessary is Ms. Sweeting, who's a participant in the video, to
25 come in and say, "Yeah, that's exactly what happened; there we

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686

32
SEALED PROCEEDINGS

1  are walking in the video," which, now that you raise it,
2  Mr. Chapman, is exactly what happened.
3           Ground 14 is my departure for the pregnancy.
4           Ground 12 -- ah, ground 12 involves Special
5  Agent Connors shouldn't have been allowed to sit at the table
6  with Mr. McMillan to allow him to prepare.  That's not correct.
7  There's an exclusion to the -- what we call the rule.
8           THE DEFENDANT:  I'm aware of that.
9           THE COURT:  Yeah.  So, ground 12 is frivolous.
10 Special Agent Connors was the case agent, so, of course, she's
11 permitted to sit in the trial.
12          Ground 13 involves my flawed jury instructions.  We
13 had a proper charge conference.  I did the best I could.  If
14 you disagree with the instructions, certainly you'll have the
15 opportunity to appeal my rulings on all of these issues,
16 authentication and otherwise, including the instructions.  And
17 perhaps the Eleventh Circuit will agree with you and will
18 reverse me, and we'll be back here for a new trial.  That's
19 always a possibility.  But I did the best that I could.
20          Ground 14 -- excuse me -- 14 was the leaving for the
21 pregnancy situation.  We've talked about that.
22          Ground 15 is more flawed jury instructions.
23          Ground 16, more about me leaving and failing to object
24 to the continuation of the trial with another judge.
25          Ground 17, the jury was deadlocked on two counts, and

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5686