## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 23-80033-CV-ALTMAN
### (CASE NO. 19-80032-CR-ALTMAN)

**CHRISTOPHER TAVORRIS WILKINS**

      **Movant,**

**v.**

**UNITED STATES OF AMERICA**

      **Respondent.**

_____/

### UNITED STATES' RESPONSE TO MOTION PURSUANT TO 28 U.S.C. § 2255

The United States, by and through the undersigned Assistant United States Attorney, hereby files its Response in Opposition to Movant's Motion to Vacate Pursuant to 28 U.S.C. § 2255 (the "Motion") (CVDE 1)[1] and states:

### I. INTRODUCTION

Movant seeks habeas relief from his conviction and judgment on eight different grounds, none of which have any merit. He claims that: (1) venue was improper as to Counts 6 and 7 of the Superseding Indictment; (2) a *Remmer* hearing should have been ordered following a communication between the court security officer and a juror; (3) the *Allen* charge coerced the jury's verdict; (4) two officers of the Court fabricated evidence, perpetrating a fraud on the Court; (5) there was ineffective assistance of counsel for failure to move for a mistrial and object to the *Allen* charge; (6) ineffective assistance of counsel for failure to request a *Remmer* hearing; (7) ineffective assistance of counsel for failure to raise multiplicity of punishment as to Counts 1, 3,

---

[1] References to CVDE relate to the docket entries in Case No. 23-80033-CR-ALTMAN whereas references to CRDE relate to docket entries in Case No. 19-80032-CR-ALTMAN.

6, and 7; and (8) ineffective assistance of counsel for failure to cross-examine CS on her alleged suicidal ideations.

Claims 1 through 4 are procedurally barred as Movant did not raise them on appeal, and he has failed to show cause and prejudice or actual innocence. The claims of ineffective assistance of counsel likewise fail. As to issue 5, defense counsel indeed objected to the *Allen* charge and moved for a mistrial. Regarding issue 6, Movant was not entitled to a *Remmer* hearing so there was nothing ineffective about defense counsel not requesting one. As for issues 7 and 8, this Court already determined that the proposed motion would have been frivolous and that defense counsel's decision not to cross-examination the witness about her suicidal ideations was a reasonable strategy decision by defense counsel. Thus, none of these claims raises a question of ineffective assistance of counsel.

For the reasons set forth herein, the Motion should be denied in its entirety without an evidentiary hearing, no certificate of appealability should be issued, and judgment should be entered against Movant.

## II. PROCEDURAL HISTORY AND STATEMENT OF THE FACTS

### a. Procedural History

A Southern District of Florida grand jury charged Christopher Wilkins ("Movant" or "Wilkins") with possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g) (Counts One and Two); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g) (Count Three); conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(b)(1)(C) (Count Four); and use of a firearm during and in relation to a drug-trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Five) (CRDE 1).

A superseding indictment subsequently charged Wilkins with two new counts—both for

witness tampering in violation of 18 U.S.C. § 1512(b) (Counts Six and Seven) (CRDE 57). Specifically, these counts charged that, from around February 26, 2018 through September 23, 2018, Wilkins: (1) attempted to prevent a government witness, CS, from testifying in the grand jury's investigation of Wilkins, in violation of § 1512(b)(1) (Count Six); and (2) attempted to "hinder, delay and prevent" CS from communicating information related to a federal offense to a United States law enforcement officer, in violation of § 1512(b)(3) (Count Seven) (*Id.*).

Wilkins proceeded to a five-day trial, concluding with a guilty verdict on Counts One, Three, Six, and Seven (CRDE 125). He was acquitted on Counts Two, Four, and Five (*Id.*). The Court denied Wilkins' *ore tenus* Rule 29 motion for acquittal at the close of the government's case, as well as his post-trial motion for acquittal or for a new trial on Counts Six and Seven (CRDE 179; CRDE 226). The Court sentenced Wilkins to 210 months' imprisonment, to be followed by three years of supervised release (CRDE 231; CRDE 249). Wilkins appealed his conviction as to Counts 6 and 7 and his sentence (CRDE 238). Thereafter, the Eleventh Circuit Court of Appeals affirmed the judgment and conviction (CRDE 271).

### b.  Statement of the Facts

On May 23, 2017, Wilkins was released from prison to a halfway house (CRDE 161:17-18).[2]  A couple of days later, he started selling crack with his then-girlfriend, CS (CRDE 161:18-19).  About every other day, CS would meet Wilkins at the halfway house and drive him to his stepfather's home, where he would pick up drugs (CRDE 161:22, 25, 67-68).  Wilkins would then sell the drugs to other residents of the halfway house (CRDE 161:68).  CS often brought her Taurus 9mm semi-automatic pistol in the car (CRDE 161:25, 72-75).  While CS drove Wilkins to pick up the drugs, which he would later sell at the residential reentry house, Wilkins would take possession

---

[2] The page numbers reference the pagination number on each individual CM-ECF docket entry in the criminal case and not the page number on the trial transcript.

of CS's loaded firearm (CRDE 161:66-68; GX 73-76 (pictures of Wilkins with the firearm)).

On one occasion, Wilkins and CS stopped at a Walmart in Lake Park, Florida, where they purchased bullets (CRDE 161:34, 37-39).  Surveillance video from Walmart admitted into evidence revealed that Wilkins grabbed the bullets out of the bullet case in the store and left the store area holding the bullets in his hands (CRDE 161:57; GX 56).  Wilkins was not permitted to possess ammunition or a firearm, as he was a convicted felon (CRDE 161:93; GX 1).  Knowing that, Wilkins had CS walk out to the car holding the bag of ammunition, as seen on Walmart video surveillance (CRDE 161:39, 52; GX 56).  After they entered CS's car, Wilkins attempted to load the bullets into a gun, which did not belong to CS, but they did not fit (CRDE 161:39-41).  CS and Wilkins then proceeded to a second Walmart store in Palm Beach County where Wilkins purchased a second box of .380 caliber ammunition (CRDE 161:41-42; 45).

Sheldon Armstrong ("Armstrong"), a five-time convicted felon and drug dealer, testified at trial that he manufactured $800 worth of crack for Wilkins while Wilkins was at the halfway house and, at Wilkins's request, he supplied Wilkins with a blackish, brownish gun that said "Russia" and had a "9" on it (CRDE 162:144, 160-161, 163; GX 167).  Although Armstrong had previously attempted to put 9-millimeter bullets in that gun, that ammunition size would not fit when he attempted to cock the gun (CRDE 162:164).

At trial, another witness, GH testified that she personally observed Wilkins carrying crack cocaine and a firearm during the timeframe he was in the halfway house (CRDE 160:154).  Although Wilkins was not allowed to have a gun in the facility, GH explained that he kept it on the side of the building on some occasions or he picked it up from his sister or father's home (CRDE 160:155, 165). She confirmed that Armstrong provided a gun to Wilkins, which Wilkins could carry every time he left the residential reentry facility and that she saw pictures of Wilkins

holding CS's gun (CRDE 160:157, 160, 164).  Regarding the crack cocaine, GH testified that, on approximately ten separate occasions, she was present when Wilkins picked it up from Armstrong or his stepfather, Paul Hayes, and on each of those occasions, Wilkins had a firearm (CRDE 160:155-157, 161, 166).  GH also stored the crack cocaine for Wilkins at her residence (CRDE 160:166).

With regard to the witness tampering counts, in August of 2017, CS learned that Wilkins had begun dating her friend, GH (CRDE 161:87).  As retaliation, CS told Wilkins that she was going to show the police incriminating photos of him holding the firearm (CRDE 161:90, 92).  Wilkins demanded that she "[e]rase those pictures" (CRDE 161:91; GX 69).  When she refused, he told her in a text message to "go get a black dress, hoe"—which she interpreted to mean "he was gonna kill me, go get a black dress [for the funeral]" (CRDE 161:92-93; GX 70).  When CS responded that she was "going to the police station right now," Wilkins said: "I control who lives or dies, bitch," making her feel "scared" (CRDE 161:93).

On September 15, 2017, Wilkins was sent back to prison for a week after an argument with the director of the halfway house (CRDE:161:27; CRDE 163:31).  When he was re-released to the halfway house on September 22, he continued dating GH (CRDE 161:27).  About a week later, Wilkins was arrested for a separate offense and taken back to prison, where he has been ever since (CRDE 161:31-32).[3]

In October of 2017, CS called the police to report Wilkins' criminal activity because she was upset about his relationship with GH (CRDE 161:28).  She met with Special Agent Sara Connors of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and showed her

---

[3] Wilkins was arrested on September 28, 2017, for strangling GH (PSI ¶ 87), which was a violation of his supervised release for a prior federal offense. *See* S.D. Fla. Case No. 13-CR-80078, DE 62.

photos and videos of Wilkins holding guns and ammunition (CRDE 161:28-29, 71-73). CS ultimately testified before the grand jury that Wilkins sold drugs while possessing a firearm, but she omitted her involvement in his drug dealing (CRDE 161:30-31).

Around this time, Wilkins and GH broke up, and Wilkins went back to CS—telling CS he loved her and wanted her back (CRDE 161:31-32). CS told him that she had been approached by law enforcement, and he instructed her to "[s]top talking to them and get a lawyer" (CRDE 161:85).

From prison, Wilkins would call CS under the jail account associated with another inmate, Robert Hartzog (CRDE 161:94-95, 99; CRDE 163:56; GX 21-30 (audio recordings and transcripts of BOP phone calls)). During several recorded phone calls in February of 2018, CS and Wilkins discussed the investigation against him (CRDE 161:95-141). CS urged Wilkins to take the investigation seriously (GX 22 [CRDE 133-1:48]).

At first, Wilkins was confident that he would be acquitted. For instance, during a February 26 phone call, he told CS the evidence against him is "hearsay" and "hearsay ain't nothing. They gotta put it together, that's the reason they contacted you to talk to you to see if you could put it [together]" (GX 22 [CRDE 133-1:48]). He continued: "they just trying to conspire a case. They don't have shit" (GX 22 [CRDE 133-1:50]; *see also* GX 24 [CRDE 133-1:56] ("I'mma tell you something about a jury. The jury ain't goin' for that shit . . .")).

When CS told Wilkins the government had more than "hearsay"—such as photos of him with firearms—Wilkins suggested an alternative reality, stating the only picture was of a "BB gun," and "that's not real . . . That's just a toy. That—you know what I'm saying? . . . There [are] no pictures of me with no guns period. You see what I'm saying?" (GX 22 [CRDE 133-1:49]). In a February 27 phone call, he continued to suggest a false narrative, saying it was his son's "BB

guns, pellet guns, [and] that shit don't mean nothing" (GX 24 [CRDE 133-1:58]).  He also said the photos "don't mean nothing" because they were from "Snapchat," and "that shit [is] edited" (GX 24 [CRDE 133-1:57]).[4]  CS then mentioned a video of them buying ammunition at Walmart, and he insisted: "I wasn't in Walmart buying no damn bullets, and you wasn't either. . . You see what I'm saying?" (GX 24 [CRDE 133-1:62]).  When she said the government had the video, he demanded to know: "how they get the video? Who told them that? How they get the dates? Somebody told them" (CRDE 161:133).

During these phone calls, Wilkins also repeatedly told CS she did not have to testify, despite her understanding that if she was subpoenaed, she would be legally required to do so (CRDE 161:126-67). For example, Wilkins told CS that "a grand jury aint goin' indict [him] off that shit" unless she went before the grand jury and "confirm[ed]" it—but "[t]here is no law saying you gotta cooperate . . . with the feds" (GX 24 [CRDE 133-1:66]).  Similarly, when CS expressed that she was concerned he would be mad if she testified against him, he assured her: "You don't have to go" (GX 24 [CRDE 133-1:61]). And, he said, if she were to testify: "all you gotta do is say, 'Man. I don't know what . . . this is . . . ' know what I'm saying?" (GX 24 [CRDE 133-1:59]; *see also* GX 24 [CRDE 133-1:62] ("You don't have to go, and if you do go, you go up there and be like 'Look, I don't wanna go. I don't know. I don't. I don't wanna deal with this.'")).

In March of 2018, CS visited Wilkins in prison, and during that visit Wilkins told her he wanted to marry her (CRDE 161:145-47; CRDE 162:18).  Around that time, CS reduced her contact with Agent Connors to "get back in [Wilkins'] good graces" (CRDE 161:148). Meanwhile, Wilkins learned that his other former girlfriend, GH, had been cooperating with the government.  He sent CS a letter threatening to "go after" GH, writing:

---

[4] Both CS and an expert on video editing testified that the photos were not edited (CRDE 161:81-82; CRDE 162:301).

> I'm trying to stay focus, because Lord knows what Ima do to dat bitch [GH]. I got her entire blood line, Fuck 'em all. They wanna scream I'm dis & dat. We gone see how they gonna explain that mess dats coming her way!! Aint shit free rockin my way. It's a price behind everything. Ah motherfucka gone learn watch.

(CRDE 161:163; GX 57 [CRDE 133-1:168]).

In June of 2018, Agent Connors discovered CS's complicity in Wilkins' drug and gun offenses (CRDE 163:28). The government executed a search warrant on CS's home, and she was arrested and charged for her participation in those crimes (CRDE 162:64-68). After retaining an attorney, CS decided to resume cooperating with ATF (CRDE 161:148). When Wilkins caught wind of CS's cooperation, he upped the ante. For instance, on July 22, 2018, he sent CS a message through the BOP's "TruLincs" email system, asking: "are you cooperating with the government now? . . . is that what I paid you for to be a snitch?" (GX 31). The next day, he wrote her: "I got all the documents of you talking, and im [sic] keeping track of everything . . . since its [sic] going like dis, *I advise you to just leave the state*" (GX 32 (emphasis added)). In that same email, he warned: "those guys know what u filed, and told the agents . . . *u cannot run or hide*" (GX 32 (emphasis added)). CS testified that she understood this to mean that Wilkins was going to "send people after [her]" and that she felt "scared" (CRDE 161:151). To secure her safety, the government relocated CS to a new residence (CRDE 161:149, 151).

Wilkins continued to harass and threaten CS throughout August and September of 2018 (GX 33-38 (TruLincs messages from Wilkins to CS)). In one TruLincs message, he wrote:

> oh so your [sic] moving and think I wont [sic] find you? Yea my ppl will let me know exactly where you at. So ill [sic] be at your door step to see my son . . . I can stop by yo dad house also. Dat skinny bitch [Agent Connors] better duck think im [sic] not gonna push her shit backwards.

(GX 36; CRDE 161:154-55). In yet another message, sent the next day, he wrote: "get outta florida why u can bruh. Why are you scared when u see my people? They know whats [sic] up, and got

all the paperwork.  Yea its [sic] best you leave bruh, becuz [sic] shit gonna hit the fan, and ah nigga like me *ready to do a life sentence bout my respect*" (GX 37) (emphasis added).

> In addition, Wilkins wrote CS a letter expressing the same sentiment on August 13, 2018:
>
> I got all your addresses. I know you moved, and I know how to get every new address location, just like I get all your paperwork off the internet. I know you cant [sic] leave the Southern District of Florida, which means I'll be right on your ass before Dec. 25, 2018. . . it's all gas, no breaks, when it comes to *dis wilding shit*. So *you better act right*. . . I'm really starting to feel like you are against me, and if it's like dat, you will be put in the category of dem fuck niggas *I'm a get when I catch them*.  So what's it gonna be?

(GX 60 [CRDE 133-1:172-74] (emphasis added); CRDE 161:171-75).

CS testified at trial that she understood "act right" to mean she better "stop talking" to ATF "or he's coming after [her]" (CRDE 161:172).  And she testified that by "dis wilding shit," Wilkins meant "he's gonna be crazy when he comes" (CRDE 161:172).  This letter, much like Wilkins' other threats, made CS feel "scared" (CRDE 161:173).

At the close of the government's case, Wilkins' counsel moved *ore tenus* for judgment of acquittal as to all counts in the Superseding Indictment (CRDE 163:61-63).  The Court denied the motion, finding that, as to Counts 1 through 4, there was testimony from several witnesses that Wilkins was dealing with drugs and possessed a firearm during the relevant period, and more specifically, as to Counts 1 and 2, there was testimony, video, and photographic evidence of his possession of a firearm and ammunition, among other evidence (CRDE 163:66-67).  With regard to Count 5, the Court noted the testimony from CS that Wilkins had the gun to assist him with drug transactions, and Sheldon Armstrong's testimony that you "can't deal drugs without a gun" (CRDE 163:67-68).  And as to Counts 6 and 7, the Court denied the motion because when viewed in the light most favorable to the government, the jury could reasonably conclude that the jail calls—coupled with the text messages, TruLincs emails, and letter—were intended to "threaten[ ]

and intimidate" CS "away from cooperating with the government" (CRDE 163:67).

After the jury returned its verdict, Wilkins threw a chair toward the prosecutor while yelling death threats and various expletives, such as: "Kill your fuckass.  I'll kill you when I catch you, boy" (CRDE 169:8); "this fuck little bitch been chasing on me for years, bro.  I aint did shit wrong man" (CRDE 169:9); "When I beat this shit, I'm gonna kill you, that's facts… I'm gonna get that black car" (CRDE 169:9-10).[5]  Wilkins was subsequently charged with assault, as well as threatening to assault and murder an Assistant United States Attorney in a separate case, *see* S.D. Fla. Case No. 21-CR-60037.

### C.  Post-Trial Motion for Acquittal and New Trial

Wilkins filed a written post-trial Rule 29 motion for acquittal and Rule 33 motion for a new trial as to Counts Six and Seven (CRDE 179).  He argued that his communications with CS could not "be characterized as acts designed to 'intimidate, threaten, or corruptly persuade' CS to do anything that she otherwise had not considered doing herself," given that she already did not want to testify or cooperate (CRDE 179:9-10).  Wilkins further claimed that "although CS repeatedly stated that she was scared of" Wilkins, "it is equally plausible that she was really scared of the Government," which coerced her to testify by charging her with federal crimes (CRDE 179:10).

After the government responded in opposition (CRDE 192), the Court issued a 28-page order denying the motion (CRDE 226).  In doing so, it explained that "even discounting *everything* CS said, the Government adduced overwhelming objective evidence—calls, text messages, emails, and (of course) the letter—of Wilkins' persuasive and unabashed course of witness tampering"

---

[5] The court reporter transcribed Wilkins' threats (CRDE 169:8-10).  A security camera also captured the assault (CR 235), but the video does not include an audio recording.

(CRDE 226:15) (emphasis in original).  It also found "compelling" evidence of Wilkins's intent to prevent CS from testifying before the grand jury (Count Six) and to dissuade her from cooperating with Agent Connors (Count Seven) (CRDE 226:17-18).  The Court then rejected each of Wilkins's arguments, emphasizing that "voluminous objective evidence" supported the jury's verdict on Counts Six and Seven (DE 226:26).

## III. ARGUMENT

### a. Legal Standards

The grounds for collateral attack on final judgments under section 2255 are "extremely limited."  *United States v. Marsh*, 548 F. Supp. 2d 1295, 1300 (N.D. Fla. 2008).  A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.  *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F. 3d 1190, 1194 n.8 (11th Cir. 2011).

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to assistance of counsel during criminal proceedings.  *See Strickland v. Washington*, 466 U.S. 668, 684–85 (1984).  When assessing counsel's performance under *Strickland*, courts employ a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.  "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]"  *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (alterations added).  "Where the highly deferential standards mandated by *Strickland* and [the] AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013) (alteration added; quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate (1) that counsel's performance was deficient; and (2) a reasonable probability that the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687–88; *see also Harrington*, 562 U.S. at 104. To establish deficient performance, the movant must show that, considering all the circumstances, "counsel's conduct fell 'outside the wide range of professionally competent assistance.'" *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1356 (11th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690). Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See Strickland*, 466 U.S. at 690–91. The court's review of counsel's performance should focus on "not what is possible or 'what is prudent or appropriate, but only [on] what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (footnote omitted; quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). Counsel is not ineffective for failing to raise non-meritorious issues, *see Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); nor is counsel required to present every non-frivolous argument, *see Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both prongs of *Strickland* if the movant makes an insufficient showing on one of the prongs. *See id.* at 697; *see also Cox v. McNeil,* 638 F.3d 1356, 1362 (11th Cir. 2011) (citation omitted) ("Because a petitioner's failure to show either deficient performance or prejudice is fatal to a *Strickland* claim, a court need not

address both *Strickland* prongs if the petitioner fails to satisfy either of them.").

**b. Issue 1 – Movant's Venue Argument Does Not Afford Him Relief**

**i. Movant's Venue Argument is Procedurally Barred**

"Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a [section] 2255 proceeding." *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011) (alteration added; citation and quotation marks omitted); *Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004) (per curiam); 28 U.S.C. § 2255(e). Procedural default may be excused if one of two exceptions applies: "(1) cause and actual prejudice, [or] (2) actual innocence." *Fordham v. United States*, 706 F.3d 1345, 1349 (11th Cir. 2013) (alteration added; citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)). Movant bears the burden of proving that either one of these exceptions would excuse a procedural default. *See Gordon v. Nagle*, 2 F.3d 385, 388 n.4 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice[.]" (alteration added; citation omitted)); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (alteration added; quotation marks and citation omitted)).

Here, there is no dispute that Movant failed to raise any venue argument on appeal. The Motion acknowledges as much, and the appellate record reflects that Movant only raised two issues – the sufficiency of the evidence on Counts 6 and 7 and his sentence. Thus, the claim is procedurally defaulted, unless he can show cause and prejudice or actual innocence. As Movant can show neither, his venue argument is procedurally barred.

*1.  Cause and Prejudice*

When an issue of procedural default arises, "the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all."  *Lynn*, 365 F.3d at 1235 (collecting cases).  Proof of cause for procedural default requires evidence that "some objective factor external to the defense prevented [Movant] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [Movant's] own conduct."  *Id.* (citing *Smith v. Jones,* 256 F.3d 1135, 1145 (11th Cir. 2001)).

While a claim of ineffectiveness may constitute cause for a procedural default, *See Murray v. Carrier*, 477 U.S. 478, 488 (1986), only a meritorious claim of ineffective assistance of counsel may constitute cause, which occurs where "the arguments the defendant alleges his counsel failed to raise were significant enough to have affected the outcome on the appeal."  *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).  Additionally, for ineffective assistance of counsel to satisfy the cause exception to a procedural bar, "the claim of ineffective assistance must have merit."  *Nyhuis*, 211 F.3d at 1344 (citation omitted).  This means that the court must decide whether the arguments counsel failed to raise were significant enough to have affected the outcome.  *Id.*

Movant's excuse for failing to raise this issue on appeal is that his counsel was ineffective (CVDE 1:4).[6]  First, this Court has already determined that such a venue argument was frivolous

---

[6] Movant also argues that his failure to raise this issue on appeal stems from the fact that the "trial transcripts" were not "available at the time to support the facts of the claim" (CVDE 1:4).  This assumes that evidence exists within these transcripts that would have supported his claim here, which as explained below, it does not.  Moreover, even if the trial transcripts would have assisted Movant here, his claim that they were unavailable to him and his counsel is belied by the record.  A review of the criminal docket reveals that all transcripts were available and provided to defense counsel prior to the date Movant filed his Motion for New Trial.  *See* (CRDE 158) (status conference transcripts); (CRDE 159-165) (trial transcripts); (CRDE 169) (verdict transcript); (CRDE 172, 173) (calendar call and December 18, 2019 hearing transcripts).

when Movant first raised issues of ineffective assistance of counsel prior to and after trial. *See*
CVDE 1-2 at 4 ("So again, reading between the lines, if what you're saying is that Mr. Chapman
wasn't willing to file a motion to try to dismiss the indictment based on improper venue, again I
don't think that he was wrong in making that decision."). Post-trial, the Court again reiterated that
counsel was not ineffective in failing to file a motion for improper venue:

> Let me say that, on page 2 of the first motion to withdraw counsel, Mr. Wilkins lays
> out all of the – what he calls ground 2, and ground 1, which to my recollection
> reraised the issues we talked about in Docket Entry 35 and 36 at the hearing in
> October, all of which are completely frivolous motions. The idea that he wasn't –
> there's an improper venue, because he was not in Palm Beach . . . The idea to split
> Counts 6 and 7 under Rule of Criminal Procedure 12. I'll just say , we've dealt
> with all of this. Mr. Wilkins in open court voluntarily withdrew that motion, so the
> attorney can't be blamed for not filing it in any event. But even had Mr. Wilkins
> not withdrawn the motion – which, of course, is not what happened – but even if
> he had not withdrawn the motion and had insisted upon it, all of these things, as we
> discussed at that hearing, have no good-faith basis. And so, no lawyer, who's an
> officer of the Court, is required to do them just because their client believes they
> should be filed.
>
> So, I find no fault with respect to any of these issues.

(CVDE 1-2 at 17).

Independent of the Court's finding to this effect, venue as to Counts 6 and 7 was proper in
the Southern District of Florida. In these counts, the Superseding Indictment charged Movant with
violating 18 U.S.C. § 1512(b). The venue provision for this statute provides as follows:

> A prosecution under this section . . . may be brought in the district in which the
> official proceedings (whether or not pending or about to be instituted) was intended
> to be affected or in the district in which the conduct constituting the alleged offense
> occurred.

*See United States v. Salman*, No. 6"17-cr-18-Orl-40KRS, 2017 WL 3034041 (M.D. Fla. July 18,
2017) (finding that the venue provision of 18 U.S.C. § 1512(i) applies to obstruction charges under
18 U.S.C. § 1512(b) and stating that official proceedings are defined as "a proceeding before a
judge or court of the United States, a United States magistrate judge . . . , or a Federal grand jury.");

*see also United States v. Barham*, 666 F.2d 521 (11th Cir. 1982) (concluding that, in an obstruction of justice charge, venue properly lies in the court that is affected by the attempt to influence, obstruct, or impede the administration of justice, focusing on the impact of the acts rather than the location of the acts).[7]

There was abundant evidence that Movant's actions toward CS impacted the administration of justice in the Southern District of Florida.  Indeed, there was an ongoing grand jury investigation pending in the Southern District of Florida when Movant began to impede the administration of justice as it relates to CS's testimony.  CS first testified before the grand jury on October 31, 2017 (*see* attached Grand Jury Testimony).  Starting as early as February 26, 2018, Movant began to contact CS to dissuade her from cooperating with the government and from testifying against him. *See, e.g. supra,* at 6-9 (examples of obstruction).  As an example, on August 13, 2018, Movant mailed CS a threatening letter to her residence in Lake Park, Florida, which is in Palm Beach County (CRDE 161: 168, GX 60).  In the letter, Movant informed CS he had all her addresses, knows she moved, had her bond paperwork, knew she could not leave the Southern District of Florida, and threatened to "be right on [her] add before December 25th of 2018" (*id.* at 171). Movant also told CS that she "better act right," which she understood to mean that she better act right or else he would come for her, that she better "stay strapped up" and that he is tracking her

---

[7]   Movant relies on *United States v. Smith*, 22 F. 4th 1236 (11th Cir. 2022) to support his venue argument.  *Smith*, however, did not involve a question of venue on an obstruction charge. Rather, it involved a venue issue in a trade-secrets charge.  Finding that the venue analysis for a charge involving trade secrets does not consider where the effects of the crime took place but instead focuses on where the conduct occurred, the Eleventh Circuit distinguished its precedent in obstruction cases.  *Smith*, 22 F. 4th at 1243.  Specifically, it stated that the offense of obstruction of justice, which is akin to the charges at issue here, involves an offense in which the essential element of the crime is defined as the effects of the act.  *Id.*  Thus, as explained by the Eleventh Circuit in *Smith*, its precedent discussing venue for purposes of obstruction is distinguishable from its venue analysis for trade secrets as the former focuses on where the effects of the conduct occurred whereas the latter focuses on where the conduct occurred.  *Id.*  For that reason, the venue test in *Smith* does not apply here.

moves, meaning she better carry a gun (*id.* at 172; 177). His communications to CS during this timeframe, including phone calls, messages, emails, and letters, were received by CS in the Southern District of Florida and were intended to impede the ongoing grand jury investigation in the Southern District of Florida.

In sum, there was no cause for Movant's failure to raise this issue on appeal as his counsel had all the transcripts and there was no resulting prejudice to Movant for failure to raise this issue. Even if counsel would have raised the issue on appeal, the outcome would have been the same. Having failed to establish cause and prejudice, Movant can only overcome procedural default by proving his actual innocence of Counts 6 and 7.

### 2. *Actual Innocence*

Alternatively, a court may consider excusing a procedural bar where the refusal to do so "would endorse a fundamental miscarriage of justice because it would require that an individual who is actually innocent remain imprisoned." *San Martin v. McNeil*, 633 F.3d 1257, 1267–68 (11th Cir. 2011) (citation and quotation marks omitted). "To establish actual innocence, [the movant] must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (alteration added; citation and quotation marks omitted). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Id.* (alteration added; quotation marks and citation omitted). "This is a narrow exception." *Fordham*, 706 F.3d at 1350 (citation omitted). For the innocence exception to apply, a movant "must show that he is factually innocent of the conduct or underlying crime that serves as the predicate for the [challenged conviction]." *McKay*, 657 F.3d at 1199 (alteration added; emphasis omitted).

Here, Movant makes no assertion that he is actually innocent of the crimes in Counts 6 and 7. Even had he alleged actual innocence, his sufficiency of the evidence arguments in a post-trial motion and on appeal both failed. This Court and the Eleventh Circuit determined there was ample evidence to support the jury's verdict of guilt on the charges. Now, on collateral attack, Movant does not add any new facts, information, or argument that would suggest he is actually innocent of this criminal conduct nor does he argue as much. As a result, he cannot raise this venue argument based on the actual innocence exception to the procedural bar defense. Having failed to establish cause and prejudice or actual innocence, Movant's venue argument is procedurally barred from raising this claim in a § 2255 proceeding.

    ii.  <u>Even if Movant's Venue Argument Were Not Procedurally Barred, Venue Was Proper as to Counts 6 and 7</u>

Even if the claim were not procedurally barred, for the reasons set forth in Section III(b)(i)(1), the venue claim fails as a matter of law and does not afford any relief to Movant.

**c.  Issue 2 – Movant's *Remmer* Argument Does Not Afford Him Relief**

    i.  <u>Movant's *Remmer* Argument is Procedurally Barred</u>

Likewise, Movant did not raise his *Remmer* argument on appeal, making it procedurally barred. This claim fares no better than the venue argument as he fails to show (1) cause and prejudice or (2) actual innocence.

*1.  Cause and Prejudice*

In his Memorandum, Movant claims his constitutional rights were violated by the failure to have a *Remmer* hearing after juror number 10 had a conversation with court security officer ("CSO") Alan Latour. He does not, however, allege there was actual cause for the failure to raise this issue on appeal. Indeed, he does not claim there was an objective external impediment to his failure to appeal this issue.

Likewise, he does not demonstrate any prejudice, in that he cannot show that the failure to raise this issue impacted the outcome of his appeal.  This is because Movant was not entitled to a *Remmer* hearing in the first instance.

In *Remmer v. United States*, 347 U.S. 227, 451 (1954), the Supreme Court explained:

> in a criminal case, a private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Remmer* involved facts that stand in stark contrast to those present here.  After the jury in *Remmer* had returned the verdict, an unnamed person had communicated with a juror, who later became the foreperson, and told him that he could profit by bringing a verdict favorable to the defendant.  *Id.* at 450-451.  The juror thereafter reported the incident to the judge, who then informed the prosecutors on an ex *parte* basis, leading an FBI agent to investigate the statement and conclude that it was made in jest.  *Id.* at 451.  The Supreme Court ultimately held that that the district court should have determined the circumstances of the juror contact, the impact thereof, and the prejudice, in a hearing with all parties present.  *Id.*

Since *Remmer*, the Eleventh Circuit has explained the contours of when the need for such a hearing arises.  In *United States v. Moore*, 854 F.3d 1322 (11th Cir. 2020), the appellate court stated that "[a] district court must conduct a *Remmer* hearing when there is evidence of outside influence."  Indeed, a district court only abuses its discretion to hold such a hearing when the evidence reveals "the jury was subjected to influence by outside sources." *Id.* (citing *United States v. Watchmaker*, 761 F.2d 1459, 1465 (11th Cir. 1985).  "To trigger the court's duty to investigate outside influences, [the defendant] must show 'clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred.'" *United States v. Pierre-Louis*,

860 F. App'x 625, 636 (11th Cir. 2021) (quoting *United States v. Benjamin*, 958 F.3d 1124, 1136 (11th Cir. 2020)).

Consistent with that rationale, the Eleventh Circuit has repeatedly rejected the need for *Remmer* hearings when there is no evidence of an outside influence.  For example, the Eleventh Circuit rejected the notion of juror misconduct in the context of *Remmer* when one of the jurors, a nursing student, explained blood tests to other jurors during the sentencing phase in a capital case. *Crawford v. Head*, 311, F.3d 1288, 1332-1334 (11th Cir. 2002).  Finding that "not every external influence on a juror results in prejudice or entitles a defendant to relief," the appellate court found that there was no evidence any juror introduced any external evidence into the jury deliberations or unduly influenced other jurors.  *Id.*

In the context of bailiff-juror contact, courts have likewise found that a *Remmer* hearing is unnecessary unless there is proof of the juror's exposure to extrinsic evidence.  *See Gavin v. Dunn*, 449 F. Supp. 3d 1174, 1207–08 (N.D. Ala. 2020), *rev'd on other grounds Gavin v. Comm'r, Alabama Dep't of Corr.*, 40 F.4th 1247 (11th Cir. 2022).  In *Gavin*, the jury was sequestered between the guilt and penalty phase of trial over the weekend and the bailiff, tasked with taking care of the jury, took the jury to play golf.  *Id.*  The district court distinguished cases in which a bailiff made an improper remark to jurors, such as comments that the defendant was guilty, answering the juror's questions without ever giving the questions to the judge, or offering suggestions to the foreperson to make the deliberations process run more smoothly.  *Id.*  Instead, the district court in *Gavin* reasoned that a *Remmer* hearing was unnecessary because there was no evidence that any improper communications took place and the evidence indicated that the bailiff was doing his job by taking care of the sequestered jurors.  *Id.*  By contrast, a *Remmer* hearing has been deemed necessary when a defendant submitted multiple affidavits from jurors establishing

that they asked a bailiff questions about parole and the bailiff answered the question, without the parties or the court being privy to the conversation.  *See Ward v. Hall*, 592 F.3d 1144, 1174 (11th Cir. 2010).

Here, there is no evidence whatsoever that the jury was subjected to influence by outside sources.  In advancing his claim that he was entitled to a *Remmer* hearing, Movant takes great liberties with the record and creates a conspiracy theory that did not exist and is not supported anywhere in the record.  Contrary to his accusations, the record reveals that during jury selection, the Court introduced the courtroom staff, and during that introduction, the Court introduced CSO Alan Latour.  In the process, the Court told the jury, that "if [they] do have questions or issues that come up during the course of the trial, please raise them with Alan, and he will be sure to raise those questions with me," informing the jurors that the Court would then address the questions as quickly as possible (CRDE 159:29).[8]

Consistent with those instructions, juror number 10 raised some questions she had with the Court's CSO during a break (CRDE 161:61-62).  This juror approached the CSO outside the presence of other jurors to ask him some questions and the CSO responded by saying: "I'm not allowed to talk to you about this, but put down whatever your question is in writing" (*id.*). Following those instructions, juror number 10 wrote down two questions on a piece of paper that were then provided to the Court and read to the parties in open court (*id.*).  The note asked: (1) "how many of us have to agree on the same verdict (guilty or innocent) for the defendant to be declared guilty or innocent?" and (2) "What does it mean 'guilty' in this case?  How many years of jail will be considered?  Minimum-maximum?  (And most likely number of years if the case is

---

[8] Consistent with this practice, the Court later instructed CSO Latour during the charge conference to inform the jurors that the Court and the lawyers were working on the instructions and would be done soon (CRDE 163:89).

guilty)?" (*id.* at 59).  The Court thereafter asked the parties how they would like to respond to the jury note (*id.*).  The government suggested informing the juror that she would receive all necessary instructions at the close of the case or alternatively, could instruct the jurors at that time (*id.* at 60). Defense counsel suggested that the juror be brought into the courtroom and colloquied as to whether the jury had already engaged in any discussions about Wilkins's guilt (*id.* at 62).

Noting that these questions came from a single juror and there was no indication that the jurors were discussing the evidence, the Court declined defense counsel's request and instead proposed bringing the juror into the courtroom to answer the two questions in the note and instruct her that she is not permitted to prejudge the case (*id.* at 63).  Neither party objected to the Court's proposal (*id.*).  The Court then brought juror 10 into the courtroom, reminded her she is not allowed to prejudge the case or decide the defendant's guilt until she has heard all the evidence in the case and inquired whether she has followed that instruction (*id.* at 64).  Juror 10 confirmed that she had followed that instruction.  The Court also instructed her that the jurors are not allowed to discuss the case with one another until they begin deliberations, and juror number 10 responded: "of course" (*id.* at 64-65).  When asked whether she followed those instructions, she responded "definitely, yes" (*id.* at 65).  The Court then instructed her in response to question 1 that the verdict must be unanimous and, in response to question 2, that if the defendant were found guilty, the punishment is for the judge alone to decide (*id.*).  After confirming that this answered the juror's questions, the Court allowed the rest of the jury to enter the courtroom and resumed the trial (*id.* at 66).

There is no evidence in the record that CSO Latour had a conversation with juror 10 other than for the limited purpose of listening to the juror's questions and then instructing the juror to write them down for the judge.  This is perfectly consistent with the instructions the Court gave to

the jurors at the outset of the trial and there is nothing nefarious about this limited interaction. Likewise, there is no indication that CSO Latour provided any information to juror 10 about facts related to the trial or that he otherwise answered her substantive questions. To the contrary, the evidence is that juror 10 immediately wrote down her questions in response to the CSO's instruction, allowing the Court and the parties to read the questions, discuss an appropriate response, and thereafter instruct juror 10 accordingly.

Additionally, and contrary to Movant's recitation of the events, the record does not suggest that an unidentified, third person informed the Court of a secret conversation between juror 10 and the CSO, that the CSO approached juror number 10 to instruct her to find Movant guilty, that the CSO provided any substantive information or otherwise answered juror 10's questions, that juror number 10 became a partial juror, that juror number 10 then relayed her conversation with the CSO to the other members of the jury,[9] or that the remaining jurors were provided information that suggested a partial position against Movant. These are all speculatory statements made up by Movant to create a narrative belied by the record. He admits as much in his Motion (CVDE 1 at 22 ) ("Leading the Defendant to speculate as to what happen [sic]."). Movant, who carries the

---

[9] Movant also claims juror 10 wrote the note on behalf of the 14 jurors. This was discussed during the trial, and it was made clear to the parties that juror 10 wrote the note on behalf of herself and not on behalf of anyone else (CRDE 161:62). Describing the note, this Court stated:

> So, my understanding, based on that interaction, is that this juror has done this on her own, based on the fact that she's written it -- well, based on two facts. One, that she waited until she was alone with Alan to begin asking the question of Alan, and that Alan instructed her to put her question down in writing, all outside the presence of the other jurors. That's one.

> And, two, then she specifically, at the top of this note, which I didn't tell you in the first instance, she wrote "Paula Thompson, participant number," and then she writes her exact juror number, suggesting, again, very strongly, that this is coming only from her and not from any of the other jurors.

(CRDE 161:62).

burden, does not provide any affidavits or evidence to support his version of events to suggest that any of the foregoing occurred or to otherwise support the contention that juror number 10 received any information because of that conversation with the CSO.

Consequently, Movant was not entitled to a *Remmer* hearing, and the Court's failure to hold a *Remmer* hearing cannot be deemed prejudicial. Without a showing of prejudice, Movant cannot overcome the procedural bar and this claim must be denied.

To the extent this claim is duplicative of Issue 6 in that Movant argues that his counsel was ineffective for failing to raise the *Remmer* hearing during trial, that issue is addressed under Issue 6 below.

### 2. Actual Innocence

Once again, Movant does not demonstrate that he is actually innocent of the counts of conviction to overcome the procedural default. He does not advance any facts, evidence, or even attempt to argue that he is actually innocent of the charges and cannot, therefore, satisfy the actual innocence exception. Therefore, this claim is also procedurally defaulted.

### d. Issue 3 – Movant's *Allen* Charge Argument Does Not Afford Him Relief

#### i. Movant's *Allen* Charge Argument is Procedurally Barred

The third issue raised in Movant's § 2255 Motion is likewise procedurally barred. There is no dispute that he failed to raise this issue on appeal. As a result, he can only raise it now by showing cause and prejudice or actual innocence. The Government will address each of these in turn below.

### 1. Cause and Prejudice

There is no dispute that the issue involving the *Allen* charge and the purported jury coercion were available at the time of Movant's appeal. To be sure, Movant does not allege that some

objective factor external to the defense prevented him from raising this claim on direct appeal. Nor could he allege this information as Movant and his counsel were present in the courtroom for the jury deliberations and all jury questions.

Similarly, Movant fails to show any reasonable probability that the outcome would have been different on appeal and cannot, therefore, show prejudice.  As explained below, not only was there no coercion of the jury, but also defense counsel indeed moved for a mistrial, despite Movant's claims to the contrary.

When determining whether a jury was coerced to render a verdict, courts consider: "(1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict." *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019).

### a.   Total Length of Deliberations

After a six-day trial, the jury deliberated for approximately ten hours.  The record reveals that the jury began its deliberations at 5:11 p.m. on November 5, 2019 (CRDE 163:196) and went home for the day at 6 p.m. (CRDE 163:199), for a total of 51 minutes of deliberations.  The jury returned to deliberate the following morning at approximately 9:30 a.m. and returned its verdict at 6:42 p.m. (CRDE 165:13), for a total of 9 hours and 12 minutes.  Thus, in total, the jury deliberated for 10 hours.

### b. The Number of Times they Reported Being Deadlocked and Were Instructed to Resume Deliberations

As indicated above, the jury deliberated for approximately 51 minutes after closing arguments (CRDE 163:196, 199). The jury returned to deliberate the following morning at approximately 9:30 a.m. and returned three notes at 11:16 a.m. with questions, which the Court answered after consulting the parties.[10]  These notes made no report of the jury being deadlocked. The jury then continued its deliberations until 12:26 p.m. when it sent another question related to the evidence, which the Court again answered after consulting the parties.[11]  This note again made no report of the jury being deadlocked.  At 1:23 p.m., the jury was brought back into the courtroom to be informed that the district court judge's wife was in labor, that he had to leave, and that another district court judge would preside over the trial (CRDE 164:17-20).

The next jury note was sent at 1:49 p.m. at which time the jury stated: "We are not unanimous on two of the counts. We are unanimous on five of the counts" (CRDE 165:3).  This was the first suggestion by the jury that it was deadlocked on two counts.  The Court thereafter consulted with the parties, and both the Government and Movant's counsel agreed that the jury should be told to continue its deliberations (CRDE 165:3-4).  Consistent with that, the Court sent back a note that said: "Please continue deliberating" (CRDE 165:4).

---

[10] The jury first asked: "For Count 4, are we basing our ruling on cocaine or any controlled substance?" The second question was: "How can we validate the date that the gun was sold from Erk's [sic] to Crystal's brother and then from the brother to Crystal?" And, the third question was: "Is there a specific time frame in regards to when we should consider tampering with the witness?" (CRDE 164:8-9).

[11] The jury asked: "Are we able to find out when Snapchat was first available for download to the public? At least the year, possibly the month" (CRDE 164:12). The juror note also contained an additional note that was crossed out.  When the Court brought the jury out, the foreperson confirmed that the crossed-out question need not be answered (CRDE 164:15).

At 4:48 p.m., the jury sent in another note in which they asked: "We have questions about Count 3, parts A and B.  Is it possible to give a verdict without specifying which weapon, or if it was A or B?"  This note made no reference to an ongoing deadlock but instead suggested the jury had continued reviewing the evidence and deliberating.  In response to the question, the Court and parties agreed that the answer to the question was "no" (CRDE 165:5).  The Court brought the jury into the courtroom to answer the question and informed them they were free to continue deliberating or could recess for the day and return the following morning (CRDE 165:8), asking for a show of hands of who wanted to leave for the day.  After none of the jurors raised their hands, the Court said: "So, with that, I'll ask you to retire and continue your deliberations" (CRDE 165:8).

At 5:56 p.m., the jury sent a note indicating a possible deadlock.  This is the second occasion in which the jurors indicated a deadlock.  The note said: "All evidence has been reviewed, and we are still completely at a deadlock on two counts" (CRDE 165:9).  At this point, the Government requested that the modified *Allen* charge be read to the jury (CRDE 165:9).  Defense counsel objected to the reading of the modified *Allen* charge and moved for a mistrial, stating:

> MR. CHAPMAN: Your Honor, I'm going to object to the reading of the modified *Allen* charge and ask that the Court declare a mistrial with respect to the two counts that they cannot come to an agreement upon.
>
> And with respect to the modified *Allen* charge, I am objecting specifically on the language of -- which states that: "If a substantial majority of you are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one, since it appears to make no effective impression upon the minds of the others." I don't think a juror should be asked to reconsider their position simply because they have been unable to persuade the majority as to their position. They -- that's their firmly held belief, and they just may not be particularly persuasive in communicating that belief.
>
> And I think that this portion of the instruction actually conflicts with the sentence in the next paragraph, which says: "Remember at all times that no juror is expected to give up an honest belief about the weight and effect of the evidence." But it seems -- I think that the sentence that I just read previously could be construed to do just that.

So, I think that there is a -- a juror could understand that as being a conflict between
those two things. So, I think in that sense, it's a confusing instruction. And so, I'm
objecting to that and asking for a mistrial as to the two counts that they're hung on.

(CRDE 165:9-10).

From there, the Court proceeded to overrule defense counsel's objection and request for a

mistrial, read the modified *Allen* charge verbatim from the Eleventh Circuit Pattern Jury

Instructions (Instruction T5) to the jury, and concluded by saying" [a]nd with that, I'll ask you to

retire and continue your deliberations" (CRDE 165:10-13).  At 6:42 p.m., the jury sent another

note, indicating they had reached a verdict (CRDE 165:13).

Thus, in total, the jury twice communicated that they were deadlocked.  In response to the

first communication to that effect and with the agreement of all parties, the jury was instructed to

"please continue deliberating."  On the second note expressing a deadlock, the Court read the

modified *Allen* charge verbatim from the jury instructions.  There was nothing coercive about the

delivery of the *Allen* charge upon the second statement of deadlock. *See United States v. Woodard*,

531 F.3d 1352, 1364 (11th Cir. 2008) ("Nothing in the circumstances surrounding the court's

reading of the *Allen* charge appears remotely coercive. When the jury first informed the court that

it was deadlocked, the court asked the jury to resume its deliberations the following day and

dismissed it for the evening.  Only after the jury informed the court for the second time that it was

deadlocked did the court give the *Allen* charge; and the court did not poll the jury before giving

the charge.").

> c. *Whether the judge knew of the jury's numerical split when*
> *he instructed the jury to continue deliberating*

There is no evidence in the record that the judge knew of the jury's numerical split as to

the two counts they were deadlocked on.  Indeed, the first note simply stated: "We are not

unanimous on two of the counts. We are unanimous on five of the counts" (CRDE 165:3). And, the second note stated: "All evidence has been reviewed, and we are still completely at a deadlock on two counts" (CRDE 165:9). The Court did not poll the jury either. Thus, there is no indication that the unknown numerical split had any impact on the Court's decision to read the modified *Allen* charge to the jurors.

> d. *Whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict*

Here, the Court read the modified *Allen* charge from the Eleventh Circuit Pattern Jury Instructions, T5, verbatim to the jury. The Eleventh Circuit has approved this instruction "on numerous occasions." *United States v. Anderson*, 1 F.4th 1244, 1269 (11th Cir. 2021) (citing *United States v. Bush*, 727 F.3d 1308, 1320 (11th Cir. 2013)); *United States v. Douglas*, 572 F. App'x 876, 877–78 (11th Cir. 2014) ("We have noted our approval of the current pattern jury instruction for an *Allen* charge, concluding that it is not, based on its language alone, inherently coercive."). In assessing the propriety of a particular *Allen* charge, the Eleventh Circuit considers whether "partial or one-sided comments were engrafted" upon the instructions, but have held that an *Allen* charge is not coercive where the district court specifically states to the jury that no juror is expected to give up his or her honest belief regarding the evidence." *Id.*

Here, the Court did not deviate from the pattern jury instruction, which the Eleventh Circuit has repeatedly approved and found not to be coercive. Included in the instruction read to the jury was a statement informing the jurors to: "[r]emember at all times that no juror is expected to give up an honest belief about the weight and effect of the evidence" (CRDE 165:12). Thus, the instruction given to the jurors was not coercive and was only given on one occasion following the jurors' second report of deadlock.

*e. The time between the final supplemental instruction and the jury's verdict*

The jurors returned a unanimous verdict approximately 40 minutes after the Court read the modified *Allen* charge.  Courts have found that a return of a verdict 30 minutes after an *Allen* charge is not coercive.  *See United States v. Chigbo,* 38 F.3d 543, 545–46 (11th Cir.1994) (finding that a 15–minute window between the *Allen* charge and the return of the jury's verdict did not demonstrate that the charge was coercive); *United States v. Scruggs,* 583 F.2d 238, 241 (5th Cir. 1978) (no abuse of discretion in giving *Allen* charge even though jury returned verdict 48 minutes later); *Vernon v. United States,* No. 8:13-CR-115-T-30MAP, 2016 WL 6822581, at *5 (M.D. Fla. Nov. 18, 2016) (finding that *Allen* charge was not coercive when the jury reached a unanimous verdict on all counts, except for one, within a few hours of deliberation, the trial court told the jurors not to give up their honest beliefs, the trial court gave the *Allen* charge after one statement of deadlock, and the jury returned the verdict within 30 minutes of the *Allen* charge).

In sum, none of the factors here weighs in favor of a finding of jury coercion.  As a result, even if Movant could establish cause, which he cannot, he cannot establish any prejudice resulting from the *Allen* charge.  For all these reasons, this claim is procedurally barred.

To the extent Movant also raises this claim in the context of ineffective assistance of counsel for failing to object and move for a mistrial, that issue is addressed under Issue 5 below.

## 2. Actual Innocence

As discussed above, Movant does not assert, much less prove, that he is actually innocent of the crimes of conviction.  Thus, he cannot overcome the procedural bar for the *Allen* charge issue on the basis of actual innocence.

### e.   Issue 4 – Movant's Fraud on the Court Argument Does Not Afford Him Relief

#### i.   Movant's Fraud on the Court Argument is Procedurally Barred

Much like the preceding three claims, this one is also procedurally barred.  Movant never raised the question of fraud on the court/prosecutorial misconduct before the appellate court. Absent a showing of cause and prejudice or actual innocence, this claim is barred.

##### 1.   Cause and Prejudice

Once again, there was nothing preventing Movant from raising this claim on appeal. Movant's claim is based entirely on the testimony presented to the grand jury and the testimony presented at trial.  As explained above, he had all trial transcripts available to him at the time of his appeal.  And, he had the grand jury transcripts available to him by the first day of trial.  He also sat through the entirety of the trial and heard the testimony with which he takes issue in the Motion. Therefore, there was nothing that prevented Movant from raising these issues on appeal and no cause for his failure to do so.

Similarly, Movant fails to show prejudice.  As explained in further detail below, the jury considered all the evidence that Movant describes as constituting a fraud on the Court and found him guilty on four counts in the Superseding Indictment.  There is no reasonable probability that the outcome would be any different had Movant raised this issue on appeal as all the evidence that purportedly constituted fraud on the Court was known to the Court and jury and formed part of the defense's trial strategy and theory of the case.  Consequently, Movant cannot overcome this procedural default on Issue 4.

##### 2.   Actual Innocence

Similarly, Movant does not prove his actual innocence.  Although he calls into question the evidence at trial, just like his counsel did at trial, he does not demonstrate his actual innocence.

He simply reiterates the same impeachment and arguments that his counsel advanced throughout the course of the trial – arguments that the jury, as the fact finder, already rejected as to Counts 1, 3, 6, and 7.  Given that Movant has failed to show he is actually innocent of the crimes of conviction, he cannot overcome the procedural default on Issue 4 on this basis either.

### ii.   Movant's Fraud on the Court Argument is Meritless

Movant spends approximately 25 pages of his Memorandum recounting details of the trial that were known to the jury, known to the Court, and were the heart of the theory of defense.  None of the practices described in the Motion, however, affords him any relief under Federal Rule of Civil Procedure 60(b) nor do they constitute prosecutorial misconduct or fraud on the Court.

First, Movant improperly seeks relief from a criminal judgment under Federal Rule of Civil Procedure 60(d)(3) (CVDE 1 at 40), relief he cannot seek in his § 2255 Motion.  The only avenue from which Movant can seek relief from his *criminal* judgment is by direct appeal, which he has already done, or pursuant to 28 U.S.C. § 2255, which allows relief for a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F. 3d 1190, 1194 n.8 (11th Cir. 2011).  A habeas petition does not allow for the sort of "fraud on the court" argument Movant advances in his Motion as that allows for relief from a *civil* judgment.

In support of his argument, Movant cites to Federal Rule of Civil Procedure 60(d)(3) and case law interpreting this rule of civil procedure.  This rule, however, only applies in habeas petitions *after* the judgment has already been entered, meaning Movant cannot use Rule 60(d)(3) to obtain relief from the *criminal* judgment in the first instance.  Put simply, it does not apply to criminal judgments.  He can only use this rule to obtain relief from a *civil* judgment, which has not

yet occurred, and Rule 60(d)(3) relief is only available under very limited circumstances.  Indeed, the Eleventh Circuit has explained that "a petitioner's attempt to *reopen a final habeas judgment* pursuant to Rule 60(b) is to be treated as an application to file a second or successive petition" and should "ordinarily be dismissed by the district court pursuant to § 2244(b)(4)."  *Gonzalez v. Sec'y for Dep't of Corr.*, 366 F.3d 1253, 1277 (11th Cir. 2004), *aff'd on other grounds sub nom. Gonzalez v. Crosby*, 545 U.S. 524 (2005).  A habeas petitioner may only seek to reopen the *civil* judgment when alleging there was a fraud on the court.[12] *Id.* at 1278.  As no civil judgment has been entered to date, Rule 60(d)(3) does not afford Movant any relief in his habeas petition.

Even if Movant's argument can be liberally construed as an argument seeking habeas relief due to prosecutorial misconduct, that argument likewise fails. "The defense [of outrageous conduct] can be invoked only in the 'rarest and most outrageous circumstances,'" *United States v. Haimowitz,* 725 F.2d 1561, 1577 (11th Cir.1984) (alterations in original), and "must be supported by more than mere speculation and theory." *United States v. Nyhuis*, 211 F.3d 1340, 1344–45 (11th Cir. 2000).  Recounting portions of witness testimony at prior evidentiary hearings or certain exhibits to suggest the witnesses were lying when the court credited that testimony without additional evidence is insufficient to satisfy this burden.  *Id.*  Unsupported allegations will not entitle a habeas petitioner to any relief.  *Id.  See also Lynn v. United States*, 365 F.3d 1225, 1237 (11th Cir. 2004) (finding that it is insufficient to support claims of prosecutorial misconduct in a § 2255 motion with affidavits that contain nothing more than conclusory allegations without any

---

[12] For example, Movant relies on *United States v. Williams,* 2012 U.S. Dist. LEXIS 24776, *1 (10th Cir. 2012) for the proposition that he is entitled to relief for fraud on the court under Rule 60(d)(3).  In *Williams*, however, the petitioner had previously moved for habeas relief, was denied that relief, had a civil judgment entered against him, and then the petitioner sought relief under Rule 60(d)(3) for fraud on the court.  *Williams* did not seek Rule 60(d)(3) relief in the original § 2255 Motion.

details or a single example as to what testimony or statements were tailored or conformed to be consistent or any statements made without personal knowledge).

Here, Movant does not provide any evidence of prosecutorial misconduct.  Instead, Movant mischaracterizes and twists the testimony of CS and Armstrong at trial to suggest fraudulent conduct that did not take place, starting with the number of times CS met with Agent Connors and AUSA McMillan.  For example, during her testimony, CS was asked how many times she met with Agent Connors.  In response, CS first said "a lot" and when asked "more than ten," she stated: "Like 70 – it was a lot, *because she moved me at the time*." (CRDE 162:15) (emphasis added). When asked to clarify how many meetings she had with Agent Connors about this case, she estimated about ten and she estimated she met with AUSA McMillan about five or six times (*id.*). At side bar, AUSA McMillan informed the Court that "a great majority of those meetings between Special Agent Connors and this witness were concerning the Pearl attacks," referring to the instances in which Movant's sister attacked CS (*id.*). The Court instructed defense counsel to limit his question to conversations about this case and defense counsel agreed. (*id.*).  On redirect, CS testified that this case has been going on for two years and that she only sat down to speak with Agent Connors and AUSA McMillian about the case about five or six times for several hours at a time (*id.* at 99).  And during those meetings, CS also discussed matters with Agent Connors, such as the logistics of her relocation as a witness to a new residence and moving her furniture (*id.* at 100).[13]  CS would also contact Agent Connors to let her know where she was located without having any discussion about her testimony in the case (*id.*).  She also denied ever being told what to say by Agent Connors or AUSA McMillan (*id.* at 101, 148).

---

[13] Although the government paid to relocate CS to another residence for her safety, Agent Connors supervised the payment of those funds, which amounted to several thousands of dollars, for the rent payment for her new apartment, requiring proof of rent payment and receipts (*id.* at 149-150).

None of the foregoing evidence suggests the perpetration of fraud on the Court or prosecutorial misconduct.  The mere fact that a witness meets with law enforcement and the prosecutor prior to trial is not indicative of any nefarious conduct, especially when the agent had to relocate the witness for her own safety.  To the contrary, it is common for witnesses to meet with the prosecutor and case agent in preparation for trial.  Further, all the foregoing evidence was disclosed in discovery to defense counsel.  The jury heard this evidence on direct, cross, and redirect examination of CS.  The jury was then free to assess the credibility of CS's testimony and question that testimony based on the number of meetings.

At trial, CS also testified on direct examination and cross-examination about the many occasions on which she misled and lied to law enforcement and the grand jury during this investigation.  CS's history of inconsistent statements was a significant feature of her testimony. On direct examination, she admitted that she did not tell the first grand jury the whole truth about the case even though she was under oath (CRDE 161:30).  Explaining that she was scared because she did not know what would happen to her and that she was trying to protect Movant, CS testified that she lied when she told the grand jury about where the gun came from that Wilkins used during drug sales, that she lied to the grand jury by omitting that she drove Wilkins to pick up the drugs, and that she lied to Agent Connors by omitting the fact that she had the gun that Wilkins used (*id.* at 31, 34).  Likewise, on cross-examination, she admitted to lying to the first grand jury that the gun shown in pictures was possibly at the house of Wilkins's sister even though she knew it was in her glove box, that she also lied to the grand jury about whether Wilkins obtained the gun from GH, that she lied when she told the grand jury that the second box of ammunition was in storage when it was in her closet, that she lied when she failed to tell the grand jury that Wilkins obtained the gun from the glove box of her car, that she lied to the first grand jury when she told them that

she was present with Wilkins when he sold drugs, and that she lied to Agent Connors about GH purchasing a gun at Mountain Sporting Goods and later providing it to Wilkins (CRDE 161:188, 189, 206, 213-214; 162:39).

Although Movant suggests there was a *Giglio* violation, there cannot be a *Brady* or *Giglio* violation when a witness' prior inconsistent statements are given to the defense. Here, the Court determined that no such violation occurred as it relates to CS's prior inconsistent statements to the grand jury. When defense counsel requested a last-minute continuance based on the newly produced grand jury testimony of CS, the Court heard oral argument to determine whether a *Brady* or *Giglio* violation occurred. The Court made the following findings:

> THE COURT: That's what it sounds like to me. It sounds like to me what you're saying is you've gotten *Jencks* with respect to a witness who's going to inculpate your client, but it's not *Giglio* because she didn't on any previous occasion, from the facts as you've recited them, Mr. Chapman, get asked about that and lie about it. So, she's never given an inconsistent story about Mr. Wilkins' involvement with Mr. Armstrong.

> MR. CHAPMAN: I think it's impeachment by omission. The fact that she never -- she was asked to say –

> THE COURT: And you certainly should be allowed to impeach her with it, and you have it now. But it's not a lie, so it's not *Giglio*. So, I don't think that's sufficient to find a *Giglio* violation.

> . . .

> But at this point, based on the things you've told me, I find either that it was disclosed to you, that there were inconsistencies as early as June, or earlier; and, secondly, that with respect to this last point on the videotape, which is readily apparent from the video itself, you have everything you need to conduct an effective two- or three- or five-question cross on that specific issue right now. And you'll have more than enough time between yesterday and tomorrow, if that's when she testifies, in order to prepare that line of questioning. So, for all of those reasons, I'm going to deny your last-minute motion to continue the trial.

(CRDE 159:20, 25). Thus, not only were the inconsistent statements provided to the defense, but defense counsel masterfully cross-examined CS for hours about each of her inconsistent

statements, getting her to admit that she lied to law enforcement and the grand jury about multiple details. Defense counsel used that disclosed *Giglio* evidence to impeach CS and call into question her credibility as a witness.[14] And the jury was free to credit or discredit CS's testimony accordingly, but this does not create an inference of fraud on the Court or prosecutorial misconduct.

Further, following trial, the Court had the opportunity to make findings about CS's testimony and the Government's evidence in response to Movant's motion for a new trial. Denying the motion, the Court found that "even discounting everything CS said, the Government adduced overwhelming objective evidence—calls, text messages, emails, and (of course) the letter—of Wilkins' pervasive and unabashed course of witness tampering." (CRDE 226:15). Explaining that when Wilkins's own words were viewed in their appropriate context ("the exboyfriend is in jail, and the woman he's imploring not to testify is the Government's star witness against him"), a reasonable inference from the evidence is that Wilkins was making his statements to "corruptly persuade" CS (*id.*). Adding to that, the Court explained "[b]ut there's just so much more" evidence (*id.*). The Court went on to quote Wilkins's own menacing words that were calculated to threaten and intimidate CS from testifying in this case, telling CS he kept track of all documents in which she is talking, telling her to leave the state, telling her that his people will find her even if she moves, and that he is willing to serve a life sentence. (*id.* at 15-16). And although this Court determined that CS "understandably testified that these statements scared her," the Court noted

---

[14] Similarly, Movant mischaracterizes the evidence as to the charges against CS. There is no dispute that CS was charged by Information and was later offered pre-trial diversion. This was a feature of her testimony at trial. The mere fact that CS waived her right to be indicted by a grand jury and agreed to proceed with charges by way of Information does not change the fact that she was formally charged with four felonies. And following these charges, the government moved for CS's pretrial detention before a federal magistrate judge, but the magistrate judge denied the government's motion and allowed CS out of custody on bond (CRDE 162:104).

that the government did not need CS's testimony for that proposition as "these statements are self-evidently menacing" (*id.*).   Thus, the Court noted that, regardless of the credibility of CS's testimony, the evidence spoke for itself.  *See id* at 26 (emphasis added) ("As the Government points out, Wilkins' conviction – which was supported by voluminous evidence – could be sustained *without any of CS's testimony*.").  The evidence of the Defendant's own words – his recorded calls, his text messages, and his letters – all corroborated CS's testimony as to Wilkins's witness tampering and obstruction efforts.  Indeed, given the mountain of objective evidence presented at trial, the Court noted that CS's "credibility was mostly (if not wholly) irrelevant to the outcome" (*id.* at 27).

To further his conspiracy theory, Movant also argues that the government coerced CS into working with the government by pressing charges against her.  However, the Court noted that there was nothing involuntary about CS's cooperation in this case.  Rejecting Wilkins's argument, this Court found there was clear evidence that "CS began cooperating with law enforcement of her own volition—apparently because she was upset about Wilkins' relationship with GH" (*id.* at 21).  Likewise, the Court found no credibility to Wilkins's contention that CS's subsequent decision to resume her cooperation—after she was charged—was anything but intentional and that CS assessed her options and made the choice that she believed was best for her in the circumstances (*id.*).  In reaching this finding, the Court compared her decision to resume cooperation after she was charged to "any run-of-the-mill decision to plead guilty," which necessarily results from the effect of an indictment (*id.* at 21-22).  The mere fact she resumed her cooperation after the indictment did not render her decision to do so any less voluntary (*id.*).  Further, in response to Wilkins' argument that CS was equally scared of the government and coerced her to testify by charging her, the Court noted that the government had a legitimate reason for charging CS in the

first place, thereby eliminating any argument by Wilkins that the government's charging decision

had some improper purpose. *See id.* at 25 ("And Wilkins cites no case or statute for the absurd

proposition that the Government's (admittedly legitimate) charging decision somehow absolved

him of his protracted and unabashed program of intimidation.")

At sentencing, the Court made similar findings regarding the credibility of CS' testimony.

The Court explained that:

> The evidence in Docket Entries -- in Government's Exhibits 31, 32, 34, 36, 37, 38,
> 60, 68, 69, and 70 are unambiguous, Mr. Wilkins repeatedly threatening CS
> with violence, threatening to kill her. That is just unmistakably clear. . . In any event,
> even if it were relevant, *C.S. testified credibly, to my mind, in front of me, under*
> *oath, and in front of the jury in a way that the jury believed that she was afraid of*
> *Mr. Wilkins,* and that it was her fear of Mr. Wilkins that caused her -- and the
> interference by Mr. Wilkins, where he tried to sway her back to him, that caused
> her to start lying to the government and refusing to cooperate with the government.

(CRDE 245: 24) (emphasis added).

Once again at sentencing, the Court reiterated what it wrote in its order on Wilkins's motion

for new trial, stating

> there was no purpose other -- in those threats, other than to get C.S., the
> government's star witness, not to testify against him, *which it's clear from those*
> *calls, emails, text messages, and the letter* is what Mr. Wilkins wanted more than
> anything in the world. He hoped to persuade her by coaxing her and pretending to
> love her and pretending to get married with her and all of the stuff that he did. When
> that didn't work, he turned up the volume and started trying to threaten her with
> violence, threaten her with his friends are going to go get her, and all of the stuff
> that's in those communications. And when that didn't work, he threatened her with
> death. And that's clear from the communications as well.

(*id.* at 25 (emphasis added)).  Further discussing CS's testimony, the Court made the following

findings: "I watched her testimony. *It was credible throughout. She admitted that she had lied*

*before. She admitted all of her contrary motivations. I watched her, I believed her.* More

importantly, 12 jurors randomly selected from the community believed her and convicted Mr.

Wilkins on both Counts 6 and 7.  The evidence with respect to Counts 6 and 7 was overwhelming"

(*id.* at 26) (emphasis added).

The arguments Wilkins raises now in which he argues that Agent Connors and AUSA McMillan coerced CS and Armstrong to lie about him are akin to the ones he made during his allocution at sentencing, which the Court also rejected.   During his allocution at sentencing, Wilkins blamed Agent Connors and AUSA McMillan for targeting him and accused the witnesses of lying about him.   Acknowledging Wilkins's arguments on this point, this Court stated:

> And if none of that were true, the defendant's performance today in his allocution, in which he takes really very little responsibility and blames everything he's done on everyone else, I think demonstrates that the defendant hasn't taken the first step in changing his life, which is acceptance. He hasn't accepted that his conduct is the conduct that has led him to be here today, that his actions are the actions that have resulted in this punishment, *that it has nothing to do really with his defense lawyers, who he's criticized, the government's lawyers, who he's criticized,* I guess he's taken issue with me before, as well.
>
> It's the defendant's conduct that has brought him to this point. *Obviously, he's taken issue with the witnesses, whom he says lied about him and continues to say were lying about him.* It's the defendant's conduct that has put him in this position, and it's the defendant's conduct for which he will be punished here today.
>
> . . .
>
> The nature of the defendant's conduct is extremely serious. That's all putting aside the fact that the defendant was seen, and there was testimony that he was seen, in possession of a firearm and ammunition, that he went to Walmart to buy ammunition with C.S., all after having been convicted many, many times over the course of his life, including six adult felony convictions that have resulted in 21 criminal history points.

(*id.* at 80-81, 83-84 (emphasis added)).

In the Motion, Movant offers no new evidence to suggest CS's testimony at trial was fabricated.  He offers nothing more than conclusion, speculation, and arguments that the Court has repeatedly rejected in the motion for new trial and at sentencing.

Similarly, Movant raises arguments about Armstrong's bias and motivation to lie in this case to suggest fraud on the Court or prosecutorial misconduct.  These are all arguments that were

a feature of Armstrong's cross-examination at trial.  Indeed, defense counsel cross-examined

Armstrong extensively about his motivation to lie to secure a better sentence for himself in ongoing

state drug charges and the inconsistencies in his first interview with law enforcement versus his

testimony in trial (CRDE 162:173-174).  In fact, Armstrong's admission of the foregoing was so

prevalent that the Court noted the following at sidebar:

> THE COURT: I think we've established that this guy lies, he lies a lot, and he only cares about himself. How much longer -- are we going to go through every statement he ever made? We're going to be here until 2025.
>
> MR. CHAPMAN: Let me look at my notes, Judge, see if I can speed it up a little bit.
>
> THE COURT: I mean you've established -- I think the jurors are ready to move on, from what I can tell.

(CRDE 162:217-218).

Armstrong also admitted that he met with Agent Connors four times and met with AUSA

McMillan on three of those occasions (CRDE 162:228).  Once again, none of this was new.  This

was all information that was timely disclosed to the defense and that defense counsel skillfully

used to call Armstrong's credibility into question during cross-examination and in closing.  There

is no evidence whatsoever that any of the foregoing constituted a fraud on the Court or

prosecutorial misconduct.  Movant's claim as to Issue 4 must, therefore, be denied.

### f.   Issue 5 – Defense Counsel was not Ineffective When the District Court Judge Instructed the Jury During Deliberations

Movant also couches his *Allen* charge argument as a claim for ineffective assistance of

counsel.  This argument has no merit as there was nothing coercive about the Court's instructions

and, therefore, nothing defective about counsel's performance.  And, as explained below, defense

counsel did exactly what Movant claims he failed to do – object to the instruction and move for a

mistrial.  Thus, Movant's ineffective assistance of counsel claim is a non-starter.

As explained above, the Court read the modified *Allen* charge to the jury only after it reported it was deadlocked on a second occasion. Notwithstanding Movant's suggestion to the contrary, defense counsel objected to the *Allen* charge before it was read to the jury. He objected to its reading in its entirety and specifically objected to the language that states: "If a substantial majority of you are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one, since it appears to make no effective impression upon the minds of the others," arguing that "a juror should [not] be asked to reconsider their position simply because they have been unable to persuade the majority as to their position" (CRDE 165:9-10). Adding to his argument, defense counsel stated that "this portion of the instruction actually conflicts with the sentence in the next paragraph, which says: 'Remember at all times that no juror is expected to give up an honest belief about the weight and effect of the evidence.'" Ultimately, defense counsel's objections were overruled, but he timely objected and articulated reasons for his objection to the *Allen* charge.[15]

Similarly, defense counsel moved for a mistrial on the two counts on which the jurors were deadlocked. *See* CRDE 165:9 ("I'm going to object to the reading of the modified *Allen* charge and ask that the Court declare a mistrial with respect to the two counts that they cannot come to an

_____

[15] At that time, the Court read the modified *Allen* charge directly from the Eleventh Circuit Pattern Jury Instructions, which are instructions the appellate court has repeatedly found to be non-coercive. As there was nothing coercive about the Court's instructions, there was no error in defense counsel's performance. *Vernon*, 2016 WL 6822581, at *7 ("because the trial Court did not err in giving the *Allen* charge, the Court also concludes trial counsel's failure to object to it does not rise to the level of deficient performance. Had Mr. Ciaravella objected to the *Allen* charge, the trial court would have overruled the objection."); *Nguyen v. United States*, No. 1:04-CV-1019-CC, 2014 WL 6667098, at *17 (N.D. Ga. Nov. 24, 2014) (concluding that "there is no reasonable probability that the outcome would have been different from the outcome in *Bush* wherein the appellate court found the *Allen* charge instruction was not coercive" had defense counsel appealed the reading of the modified *Allen* charge in the pattern jury instructions). Thus, even if defense counsel had not objected to the *Allen* charge, such a failure to object would not have given rise to a claim for ineffective assistance of counsel.

agreement upon.").  At the conclusion of his objection to the *Allen* charge, defense counsel reiterated his request for a mistrial by stating: "And so, I'm objecting to that and asking for a mistrial as to the two counts that they're hung on" (CRDE 165:10).  Thus, defense counsel's performance cannot be deemed defective when he took the exact steps Movant contends were necessary at trial – objecting to the *Allen* charge and moving for a mistrial.[16]  Accordingly, Movant's claim on this issue must be denied.

### i.  No Prejudice

Likewise, Movant cannot establish prejudice when defense counsel indeed objected to the *Allen* charge and moved for a mistrial.  In response, the Court overruled defense counsel's objection and motion.  Thus, there is nothing else defense counsel could have done under the circumstances and no reasonable probability of a different outcome.  Absent such evidence, Movant has failed to prove that he was prejudiced by his counsel's performance.

### g.  Issue 6 – Defense Counsel was not Ineffective When He Failed to Request a *Remmer* Hearing

### i.  <u>No Defective Performance</u>

For the reasons explained in Section III(b) above, Movant has not shown that a *Remmer* hearing was warranted under the circumstances.  He does not provide any evidence that juror number 10 or any members of the jury were exposed to extrinsic evidence beyond his mere speculation that there must have been more to the interaction between the CSO and juror number 10.  *See Fredericks v. United States*, No. 5:20-cv-401-Oc-27PRL, 2021 WL 779081 *1, at 4 (M.D.

---

[16] Even if defense counsel did not move for a mistrial, the decision to move for a mistrial is a tactical decision left to defense counsel to make. *United States v. Burke*, 257 F.3d 1321, 1324 (11th Cir. 2001) ("We conclude that the decision to refrain from asking the court for a mistrial is a tactical decision entrusted to defense counsel, binding the defendant even when the defendant expressed a contrary wish to his lawyer.").

Fla. March 1, 2021) (finding no finding of defective performance by counsel when the petitioner failed to show that the jury was exposed to extrinsic evidence).  There is no good-faith basis for defense counsel to request a *Remmer* hearing without evidence that the jury was exposed to extrinsic evidence.  *See Breal v. United States*, No. 12-CR-20152, 2017 WL 11420853, at *6 (S.D. Fla. Jan. 19, 2017), *report and recommendation adopted,* No. 12-20152-CR, 2017 WL 11420846 (S.D. Fla. Feb. 28, 2017) (finding that there was no evidence that the juror received any extrinsic information relevant to the case when texting/speaking to non-juror during deliberations and, consequently, defense counsel had no basis to request a *Remmer* hearing).

Without any evidence of outside influence, defense counsel had no good-faith basis to request a *Remmer* hearing from the Court.  Without a basis to act, defense counsel cannot be deemed deficient in his performance at trial.  *See Nix v. United States*, No. 09-80015-CR, 2013 WL 6188976, at *3, n.3 (S.D. Fla. July 19, 2013), *report and recommendation adopted,* No. 09-CR-80015, 2013 WL 6190860 (S.D. Fla. Nov. 26, 2013) ("It bears noting that it is not professionally unreasonable for a lawyer to fail to pursue issues which have little or no chance of success, and a criminal defendant is not prejudiced by counsel's failure to pursue nonmeritorious claims or those on which they likely would not have prevailed.").

### ii.  No Prejudice

Likewise, Movant fails to show how the failure to request the *Remmer* hearing prejudiced his defense.  His speculation, standing alone, as to the outcome does not satisfy his burden on collateral attack.  *Fredericks*, 2021 WL 779081 at *4 (finding that claim in § 2255 motion failed when the movant did not show that his counsel's failure to request a *Remmer* hearing caused any prejudice); *Breal*, 2017 WL 11420853, at *6 (determining that the movant failed to establish any prejudice for the failure to request a *Remmer* hearing because even if the movant argued the jurors

were biased against him, such claims would be purely speculative and belied by the record); *Dahn v. Reddish*, No. 1:05-CV-79 WLS, 2012 WL 3027106, at *2 (M.D. Ga. July 24, 2012) (concluding that the movant failed to show prejudice for his counsel's failure to request a *Remmer* hearing when he simply made conclusory and wholly incredible claims that juror bias would have been shown through a hearing, leading to the juror's excusal and a not guilty verdict); *Wilson v. United States*, No. 04-20487-CR, 2011 WL 2909887, at *3 (S.D. Fla. July 18, 2011), *aff'd*, 505 F. App'x 884 (11th Cir. 2013) (finding no evidence of defective performance or prejudice when defense counsel did not request a *Remmer* hearing as there was no indication the jury was exposed to extrinsic evidence).

Here, Movant cannot show any prejudice.  Indeed, he does not provide any evidence to show that, had his counsel requested the *Remmer* hearing, it would have been granted, or that the outcome of the trial would have been any different.  He instead makes broad speculative statements about juror bias, but he does not provide anything to substantiate these assertions.  The record suggests there was no juror bias as the jury acquitted Movant of three counts in the Superseding Indictment – Counts Two, Four, and Five.  A split verdict suggests that the jury carefully and thoughtfully reviewed the evidence during deliberations and ultimately decided to only convict Movant of those counts in which his guilt was proven beyond a reasonable doubt.  *See United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000) ("The careful weighing of evidence inherent in a split verdict makes the verdict itself 'evidence that the jury reached a reasoned conclusion free of undue influence and did not decide the case before the close of evidence.'").  Given Movant's inability to show defective performance or prejudice, his claim for ineffective assistance of counsel fails.

### h.  Issue 7 – Defense Counsel was not Ineffective When He Failed to Raise Multiplicity of Punishment

#### i.  No Defective Performance

Movant next contends that his counsel was ineffective when he failed to raise multiplicity of punishment in the Superseding Indictment as to Counts 1 and 3 and Counts 6 and 7.  His claims fail because his counsel was not required to file a meritless motion.  Not only did his counsel research the issue of multiplicity of punishment and found that he could not argue such a motion in good faith, but the law demonstrates that such an argument is patently frivolous.

"An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Davis*, 854 F.3d 1276, 1289 (11th Cir. 2017) (citing *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012)).  If an indictment is multiplicitous, it "violates double jeopardy principles by giving the jury more than one opportunity to convict the defendant for the same offense." *Id.* (quoting *United States v. Jones*, 601 F.3d 1247, 1258 (11th Cir. 2010)).  In such an instance, the first step in a double jeopardy analysis involves a determination as to whether the legislature intended that each violation be a separate offense.  *Id.* When the legislative intent is unclear, courts apply the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  Using the *Blockburger* test, two offenses are different for double jeopardy purposes "if each 'requires proof of an additional fact which the other does not.'"  *Id.* (citations omitted).  This means that "if an offense requires proof of an element that the other offense does not, we need look no further in determining that the prosecution of both offenses does not offend the Fifth Amendment." *Id.* (quoting *United States v. Hassoun*, 476 F.3d 1181, 1186 (11th Cir. 2007)).

Regarding felon-in-possession charges, "[d]ouble jeopardy protects against government attempts to charge separate dates in separate counts where possession was a continuous course of

conduct." *United States v. Jones*, 601 F.3d 1247, 1259 (11th Cir. 2010). Although "simultaneous possession of a firearm and ammunition should be punished as one offense," if a defendant possesses different weapons at different times or places, then the government may charge them as separate units of prosecution. *Jones*, 601 F.3d at 1258-59 (finding no double jeopardy when the defendant was charged with possessing .38 caliber ammunition and a firearm on one day and with possessing .44 caliber ammunition on a separate date); *see also Harris v. United States*, No. 611CR206ORL31GJK, 2016 WL 1588545, at *4 (M.D. Fla. Apr. 20, 2016) ("Petitioner was charged in Counts Three and Eight with possessing different ammunition at different times. . . . Therefore, the Government permissibly treated them as separate units of prosecution and was allowed to charge them as multiple counts."); *United States v. Touray*, No. 120CR00103TWTLTW, 2021 WL 6066101, at *6 (N.D. Ga. Sept. 3, 2021), *report and recommendation adopted*, No. CV 1:20-CR-103-TWT, 2021 WL 5195645 (N.D. Ga. Nov. 8, 2021) (finding no double jeopardy when the defendant was charged with possessing two different firearms found in different locations at different times in two separate counts in the indictment).

Here, Count 1 charged Movant as a felon in possession of ammunition, specifically fifty rounds of Winchester 9mm ammunition on July 13, 2017, in Lake Park, Florida, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 2 (CRDE 57). Count 3, on the other hand, charged Movant with felon in possession of one or more firearms, specifically a Taurus Model P7-709 Slim 9 mm semi-automatic pistol and a Russian Makarov 9 mm Makarov semi-automatic pistol between on or about May 24, 2017, and September 28, 2017, in Palm Beach County, Florida, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2 (CRDE 57). Thus, the Superseding Indictment charged Movant in one count with possession of a specific type of ammunition on one date in one location within Palm Beach County and in another count with continuing possession of two firearms

throughout a four-month period throughout Palm Beach County.  As Movant was charged with possessing different prohibited items on different dates in different locations, these are separate offenses and no double jeopardy exists.

Similarly, no double jeopardy existed as to Counts 6 and 7.  Count 6 charged Movant with having knowingly intimidated, corruptly persuaded, and engaged in misleading conduct, and attempting to intimidate, threaten, corruptly persuade and engage in misleading conduct toward CS *with the intent to influence, delay, and prevent CS's testimony in an official proceeding*, consisting of the grand jury's investigation into Movant, in violation of 18 U.S.C. § 1512(b). Count 6 tracks the language of 18 U.S.C. §1512(b)(1) (CRDE 57).  On the other hand, Count 7 charged Movant with knowingly intimidating, threatening, corruptly persuading, and engaging in misleading conduct, and attempting to intimidate, threaten, corruptly persuade, and engage in misleading conduct toward CS, *with the intent to hinder, delay, and prevent the communication by CS to a United States law enforcement officer relating to the commission of a federal offense*, in violation of 18 U.S.C. § 1512(b) (CRDE 57).   Thus, Count 7 tracks the language of 18 U.S.C. § 1512(b)(3).

Following the *Blockberger* test, each of these offenses required proof of different facts that the other did not require and they were each proscribed by a different statutory provision.  In particular, Count 6, which is alleged under § 1512(b)(1), required proof that Movant acted with the intent to influence, delay, and prevent CS's testimony in an official proceeding, specifically the grand jury proceedings.  In contrast, Count 7, which is alleged under § 1512(b)(3), required proof that Movant acted with the intent to hinder, delay, and prevent the communication by CS to a United States law enforcement officer relating to the commission of a federal offense.  Because each offense required different proof as to intent, the jury could have found that Movant had the

intent to prevent CS from testifying at the grand jury but find that he did not have the intent to prevent her from communicating with a United States law enforcement officer.  The converse also holds true.  Thus, each offense required proof of different facts, eliminating any argument that they were multiplicitous.  *See United States v. Davis*, 854 F.3d 1276, 1290 (11th Cir. 2017) (finding that witness tampering and obstruction of justice charges were not multiplicitous when each charge is proscribed by a separate statutory provision and the facts necessary to prove one count are not necessary to prove the other); *see also United States v. LeMoure*, 474 F.3d 37, 43–44 (1st Cir. 2007) (finding no multiplicity when the defendant was charged with two counts of witness tampering under § 1512(b)(1), one count of obstruction of justice by fabricating witness testimony under § 1503, and two counts of tampering with specific grand jury witnesses under § 1503 because each offense required one or more elements not required for the other offense).

Consistent with the law and the *Blockberger* test, defense counsel explained at the December 16, 2019 hearing that he researched the matter of multiplicity involving the firearm charges "only to realize there was no good-faith basis to file that" (CVDE 1 at 17).  Agreeing with defense counsel, this Court characterized this multiplicity of punishment argument, along with the above venue argument, as "completely frivolous motions" (CVDE 1 at 17).  Further, the Court explained that "even if [Movant] had not withdrawn the motion and had insisted upon it, all of these things, as we discussed at that hearing [referring to a prior status conference], have no good-faith basis.  And so, no lawyer, who's an officer of the Court, is required to do that because their client believes that they should be filed. So, I find no fault with respect to any of those issues" (CVDE at 17).

Given the frivolity of a motion to dismiss Counts 1, 3, 6, and 7 for multiplicity of punishment, defense counsel's performance cannot be deemed defective for failing to file such a motion.  The claim should, therefore, be denied under this *Strickland* prong.

       ii.   No Prejudice

In addition, the Court can deny this claim under the prejudice prong.  This is because any motion seeking to dismiss Counts 1, 3, 6, and 7 of the Superseding Indictment under this multiplicity of punishment argument would be denied under the well-settled law discussed above. As a result, Movant cannot demonstrate a reasonable probability that the outcome of the case would have been different and cannot prove that he was prejudiced by defense counsel's failure to file the requested motion.

      **i.   Issue 8 – Defense Counsel was not Ineffective When He Failed to Cross-Examine CS About Her Alleged Suicidal Ideations**

       i.   No Defective Performance

Movant next faults defense counsel for failing to cross-examine CS about her alleged suicidal ideations prior to trial.  As the Court already noted, defense counsel's strategy decision here did not constitute ineffective assistance of counsel and cannot be a basis to vacate the jury's verdict.

"Judicial scrutiny of counsel's performance must be highly deferential." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (quoting *Strickland,* 104 S. Ct. at 2065). Courts "must avoid second-guessing counsel's performance as ineffective assistance of counsel does not arise simply when an attorney takes a different approach from the one the court may have chosen." *Id.*  "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* (quoting *Strickland,* 104 S. Ct. at 2065-66).  As long as the approach

may be considered a sound trial strategy, defense counsel cannot be adjudged incompetent for performing in a particular way. *Id.* To satisfy the burden to prove ineffective assistance of counsel and demonstrate the conduct was unreasonable, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315. When it comes to cross-examination, the decision to cross-examine and the manner of the cross-examination "are strategic decisions entitled to deference." *Sanders v. Sec'y, Dep't of Corr.*, No. 8:09-CV-2509-T-23TGW, 2013 WL 1233127, at \*23 (M.D. Fla. Mar. 27, 2013)(citing *Dorsey v. Chapman,* 262 F.3d 1181 (11th Cir.2001)). "Misgivings about hurtful cross-examination and rebuttal witnesses have been decisive to the Supreme Court when it determined that counsel was effective." *Chandler*, 218 F.3d at 1321. It also bears noting that "[a] defendant's disagreements with counsel's tactics or strategies will not support a claim of ineffective assistance of counsel." *Sanders*, 2013 WL 1233127 at \*23; *see also Dorsey*, 262 F.3d at 1185-86 (finding that defense counsel's decision not to challenge the credibility of a witness's alternate personalities by refusing to cross-examine was not patently unreasonable).

In support of his position, Movant cites to cases in which the defendant was prevented from cross-examining a witness about a certain subject at trial and was, therefore, denied the right to confront the witness.[17] These cases are inapposite. There is nothing indicating that Movant's counsel was prevented from cross-examining CS about her mental health issues. Instead, Movant's counsel made the strategic decision not to cross-examine CS about these issues, which is different, and that strategy decision is subject to deference.

---

[17] Movant cites to *Davis v. Alaska*, 415 U.S. 308 (1974); *United States v. Williams*, 592 F.2d 1277 (5th Cir. 1979); *Greene v. Wainright*, 634 F.2d 272 (5th Cir. 1981); *United States v. Summers*, 598 F.2d 450 (5th Cir. 1979); and *United States v. Lindstrom*, 698 F.2d 1154, 1163 (11th Cir. 1983).

At the December 18, 2019 hearing, defense counsel explained that he reviewed the transcript of a phone call between CS and Movant in which CS stated she was suicidal. Defense counsel further explained that CS did not say *why* she was suicidal, which concerned him because she could then respond that she was suicidal because Movant was constantly calling her from jail and driving her crazy (CVDE 1 at 15). Without anything to impeach her explanation as to why she was suicidal, as compared to other inconsistent statements in which a transcript was available for impeachment, defense counsel made a strategy decision not to use such evidence on cross-examination (*id.*).

The Court has already determined there was no ineffective assistance of counsel with regard to defense counsel's strategy in not impeaching CS as to her mental health issues. At the December 18, 2019 hearing, this Court made the following findings:

> But I find that there is no such ineffectiveness on the part of your counsel for refusing to play that call, because it's an obvious strategic call, and not, in any event, unreasonable in my view.
>
> First of all, to question a female witness in a case involving a male defendant who's alleged to have threatened her and oppressed her, in some ways, over and over again in front of a jury that involved both men and women, to try to blame her and make her seem crazy because of her suicidal thoughts, seem to me a very poor idea.
>
> In any event, it was an idea that clearly could have backfired in a manner of ways. One of which is, the jurors would just find it distasteful that you and your lawyer were bringing out all this very dirty laundry with respect to her mental state.
>
> Second, and more importantly, that it gave her the opportunity, as Mr. Chapman said, to come back with, of course, I'm suicidal. Look at this guy I'm dealing with and all the horrible things he's saying to me. And let me point back to this text message where he told me to go get a black dress for my own funeral and called me a hoe, and all these other horrible things he said to me, why wouldn't I be suicidal under these circumstances?
>
> Instead, it seemed a much better strategy to do as Mr. Chapman did, which was to stick to all the facts he could always impeach her on. And finally, he did a tremendous job of having on questions, she denied it, or she couldn't remember, and he always had the exact citation ready in a previous transcript to come back to

here and impeach her with it.

And it wasn't unreasonable -- and this is the third point – to think, given all of that impeachment evidence, that was clearly proven, of situations where she was either changing her story or not remembering the story, to refuse to impeach her with something where he didn't – excuse me – refuse to question her with something that he didn't then have a backup impeachment cite to go to. In other words, with so many of the other impeachment moments, when she said X, Y, or Z. Great impeachment.

With this one, if she had said, "I was suicidal because of Mr. Wilkins and all the things he's done to me," he had nothing to fall back on to, to impeach her with that. And it wasn't unreasonable to refuse to get into that.

So, there was no *Brady* violation, and I don't think there was any ineffective assistance of counsel in this strategic call.

CVDE 1-3 at 16.

Thus, defense counsel's strategic decision not to impeach CS with this phone call was not an unreasonable decision, and Movant has failed to show that no competent lawyer would have made the same decision. As a result, Movant cannot demonstrate a defective performance by defense counsel and this claim does not afford him any relief.

ii. No Prejudice

Similarly, Movant fails to show that he was prejudiced by this cross-examination strategy. Defense counsel impeached the credibility of CS for hours. As explained above, he impeached her on every single inconsistency from her grand jury testimony and statements she made to the government during the investigation. Defense counsel did so skillfully and effectively.

Despite this, Movant fails to demonstrate how the failure to cross-examine CS on this particular phone call would have resulted in a different outcome at trial and provides mere speculation as to a different result. As explained above, such a strategy, if employed, could have backfired. CS could have testified that Movant was the reason she was suicidal and such testimony would have served as further proof that CS felt threatened and intimidated by Movant. This would

have only added to the government's evidence of his guilt on Counts 6 and 7. Without any evidence that a reasonable probability exists that, but for the failure to elicit this cross-examination, Movant would have been found not guilty on all charges, he cannot overcome his burden to prove prejudice. As a result, Movant's claim fails for this additional reason.

### j.   There is No Need for an Evidentiary Hearing

In his 104-page Motion, Movant does not request an evidentiary hearing to resolve any of the issues in his Motion. In a habeas corpus proceeding, the petitioner has the burden to establish the need for an evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318–19 (11th Cir. 2016). Here, the issues presented can be resolved based on the record. Indeed, because the Court can "adequately assess [Movant's] claim[s] without further factual development[,]" he is not entitled to an evidentiary hearing. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003) (alterations added).

### k.   No Certificate of Appealability Should Issue

A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (alteration added). The Supreme Court has described the limited circumstances when a certificate of appealability should properly issue after the district court denies a habeas petition:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy [section] 2253(c) is straightforward: The [Movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (alterations added). Movant does not satisfy this

burden, so the Court should not issue a certificate of appealability

## IV. CONCLUSION

For the reasons explained above, the Government respectfully requests that Movant's Motion to Vacate Pursuant to 28 U.S.C. § 2255 be denied, that no evidentiary hearing be granted, that no certificate of appealability be issued, and that final judgment be entered against Movant.

Respectfully submitted,

MARKENZY    LAPOINTE
UNITED                STATES
ATTORNEY

By:    *s/ Marty Fulgueira Elfenbein*
MARTY FULGUEIRA ELFENBEIN
Assistant United States Attorney
Florida Bar No.: 0020891
99 Northeast 4th Street
Miami, Florida 33132
Telephone: (305) 961-9446
Email: Marta.Elfenbein@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 7, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and delivered the document by United States Mail to *pro se* movant Christopher Tavorris Wilkins, Reg. No.: 02920-104, Coleman I-USP, United States Penitentiary, Inmate Mail, P.O. Box 1033, Coleman, FL 33521.

*s/ Marty Fulgueira Elfenbein*
MARY FULGUEIRA ELFENBEIN
Assistant United States Attorney
